UNITED STATES BANKRUPTCY COURT
DISTRICT OF RHODE ISLAND

_____

IN RE:
NEIL H. SAUNDERS,                          Chapter 11
             DEBTOR.                       Case No. 11-12960-WCH

_____

**MEMORANDUM OF DECISION**

TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................................. 1

II. BACKGROUND .................................................................................................................. 2

   A. Events Leading to the Debtor's Bankruptcy Filing ...................................................... 2

   B. The Debtor's Bankruptcy Filing ................................................................................... 6

   C. The Debtor's Initial Reorganization Efforts................................................................ 12

   D. The 02908 Club .......................................................................................................... 13

   E. The October 5, 2012 Meeting..................................................................................... 14

   F. Allegations of Bad Faith and Dual Track Towards Confirmation ...................................... 21

   G. The Debtor's Plan ....................................................................................................... 26

   H. The 02908 Plan ........................................................................................................... 40

   I. Preference Voting Results ............................................................................................ 43

III. POSITIONS OF THE PARTIES ...................................................................................... 44

   A. The Debtor's Plan ....................................................................................................... 44

      1. The Debtor ............................................................................................................. 44

      2. The 02908 Club...................................................................................................... 45

   B. The 02908 Plan ........................................................................................................... 48

      1. The 02908 Club...................................................................................................... 48

      2. The Debtor ............................................................................................................. 48

   C. Confirming "Only One Plan" under 11 U.S.C. § 1129(c)................................................ 49

      1. The Debtor ............................................................................................................. 49

      2. The 02908 Club...................................................................................................... 50

IV. DISCUSSION ................................................................................................................... 51

   A. Confirmability of the Debtor's Plan............................................................................ 52

      1. The 02908 Club's Standing to Object.................................................................... 52

      2. Denial of Confirmation under 11 U.S.C. § 105(a).................................................. 52

      3. 11 U.S.C. § 1129(a)(1)........................................................................................... 57

      4. 11 U.S.C. § 1129(a)(2)........................................................................................... 57

      5. 11 U.S.C. § 1129(a)(3)........................................................................................... 58

      6. 11 U.S.C. § 1129(a)(4)........................................................................................... 58

      7. 11 U.S.C. § 1129(a)(5)........................................................................................... 59

8. 11 U.S.C. § 1129(a)(6)..............................................................................................60

9. 11 U.S.C. § 1129(a)(7)..............................................................................................60

10. 11 U.S.C. § 1129(a)(8)............................................................................................60

11. 11 U.S.C. § 1129(a)(9)............................................................................................61

12. 11 U.S.C. § 1129(a)(10)..........................................................................................62

13. 11 U.S.C. § 1129(a)(11)..........................................................................................62

14. 11 U.S.C. § 1129(a)(12)..........................................................................................65

15. 11 U.S.C. § 1129(a)(13)..........................................................................................66

16. 11 U.S.C. § 1129(a)(14)..........................................................................................66

17. 11 U.S.C. § 1129(a)(15)..........................................................................................66

18. 11 U.S.C. § 1129(a)(16)..........................................................................................67

19. 11 U.S.C. § 1129(b)................................................................................................67

20. 11 U.S.C. § 1129(d)................................................................................................68

21. 11 U.S.C. § 1129(e)................................................................................................68

B. Confirmability of the 02908 Plan.............................................................................68

1. 11 U.S.C. § 1129(a)(1)..............................................................................................68

2. 11 U.S.C. § 1129(a)(2)..............................................................................................69

3. 11 U.S.C. § 1129(a)(3)..............................................................................................69

4. 11 U.S.C. § 1129(a)(4)..............................................................................................69

5. 11 U.S.C. § 1129(a)(5)..............................................................................................70

6. 11 U.S.C. § 1129(a)(6)..............................................................................................70

7. 11 U.S.C. § 1129(a)(7)..............................................................................................70

8. 11 U.S.C. § 1129(a)(8)..............................................................................................72

9. 11 U.S.C. § 1129(a)(9)..............................................................................................72

10. 11 U.S.C. § 1129(a)(10)..........................................................................................73

11. 11 U.S.C. § 1129(a)(11)..........................................................................................74

12. 11 U.S.C. § 1129(a)(12)..........................................................................................75

13. 11 U.S.C. § 1129(a)(13)..........................................................................................75

14. 11 U.S.C. § 1129(a)(14)..........................................................................................75

15. 11 U.S.C. § 1129(a)(15)..........................................................................................75

16. 11 U.S.C. § 1129(a)(16)..........................................................................................76

17. 11 U.S.C. § 1129(b) ........................................................................................ 76

18. 11 U.S.C. § 1129(d) ....................................................................................... 77

19. 11 U.S.C. § 1129(e) ....................................................................................... 78

C. Confirming "Only One Plan" under 11 U.S.C. § 1129(c) ................................... 78

V. CONCLUSION ..................................................................................................... 80

# I. __INTRODUCTION__

The matters before the Court are: (1) the "Debtor's Fourth Amended Plan of Reorganization"[1] (the "Debtor's Plan") filed by Neil Saunders (the "Debtor"); (2) the "Objection of The 02908 Club Holdings, LLC to Debtor's Fourth Amended Plan of Reorganization"[2] (the "02908 Objection") filed by The 02908 Club Holdings, LLC ("The 02908 Club"); (3) the "Third Amended Chapter 11 Plan of Reorganization (submitted by The 02908 Club Holdings, LLC)"[3] (the "02908 Plan") filed by 02908; and (4) the "Objection to the Third Amended Plan of Liquidation filed by Creditor 02908 Club Holdings, LLC"[4] (the "Debtor's Objection").  The Debtor and The 02908 Club have filed competing plans that both contemplate full repayment of all creditors, albeit through different means.  Each argues that the other's plan does not satisfy the requirements of confirmation under 11 U.S.C. § 1129 and/or that their plan is otherwise preferable to the other and should be confirmed.

I held a two-day evidentiary hearing on both plans on February 19, 2013 and February 20, 2013, at which time five witnesses testified and six exhibits were admitted into evidence. Notwithstanding any lack of express reference below, I have reviewed the entire record, including the docket of this case,[5] all six exhibits in evidence, and the trial testimony each of the five witnesses.  Information that is ultimately irrelevant to my determination of these matters and would serve only to complicate and confuse the issues has been intentionally omitted and does

---

[1] Docket No. 582.

[2] Docket No. 648.

[3] Docket No. 587.

[4] Docket No. 655.

[5] _LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)_, 196 F.3d 1, 8 (1st Cir.1999) (a court may take judicial notice of its own records)

not suggest a lack of consideration.  To the contrary, upon consideration of the entire record now

before me, the following constitutes my findings of fact pursuant to Fed. R. Civ. P. 52(a)(1),

made applicable to contested matters by Fed. R. Bankr. P. 7052 and Fed. R. Bankr. P. 9014(c).

Therefore, for the reasons set forth below, I will confirm the Debtor's Plan.

## II. <u>BACKGROUND</u>

A. <u>Events Leading to the Debtor's Bankruptcy Filing</u>

The Debtor is fifty-five years old.[6]  He has been married to Ann Saunders for over thirty-

years and is not subject to any domestic support obligations.[7]  The Debtor obtained a Bachelor of

Arts in English from the University of Rochester in 1985.[8]  Although the Debtor currently holds

no professional licenses, he previously was a licensed real estate salesperson, mortgage broker,

and mortgage lender.[9]

From 1987 to approximately 2009, the Debtor owned Greenwich Mortgage Corporation

("Greenwich Mortgage"), a Rhode Island licensed residential mortgage broker rendering its

clients assistance with obtaining and refinancing residential mortgages.[10]  Prior to 2010,

Greenwich Mortgage was the main source of the Debtor's income.[11]  Due to the economic

---

[6] Trans. Feb. 19, 2013 at 88:20-21.

[7] *Id.* at 88:23-25; 89:1.

[8] *Id.* at 85:23-25; 86:1-4.

[9] *Id.* at 86:5-13.

[10] *Id.* at 86:14-18; Debtor's Fourth Amended Disclosure Statement, Docket No. 583 at 4.

[11] Trans. Feb. 19, 2013 at 155:16-20.

downturn of the real estate and residential lending markets, Greenwich Mortgage ceased operations and its corporate status was revoked in November, 2009.[12]

The Debtor acquired numerous investment properties between 1987 and 2006 which he leveraged in an attempt to keep Greenwich Mortgage afloat.[13]  Twelve investment properties are located in the City of Providence, Rhode Island (the "Rental Properties").[14]  Eight of the Rental Properties are located on Eaton Street between the lower gate of Providence College and Huxley Avenue, while the remaining Rental Properties are about three or four houses down from Eaton Street.[15]  Due to the ideal location of the Rental Properties, the Debtor has always rented them to local area college students.[16]  As will be discussed in greater detail below, the Debtor also managed six additional rental properties in the same area that were titled in the name of his sister Allison Saunders (the "Sister Properties").[17]

The Debtor's other investment properties included raw land located on Boston Neck Road in North Kingstown, Rhode Island and a single family home on 945 High Hawk Road in East Greenwich, Rhode Island.[18]  He and Ann Saunders also owned a single family home on

---

[12] *Id.* at 156-158; Debtor's Fourth Amended Disclosure Statement, Docket No. 583 at 4-5.  At trial, counsel to 02908 questioned the Debtor extensively about whether Greenwich Mortgage was unable to continue operations or whether the Debtor decided not to continue the business.  Such distinctions are irrelevant to the matter now before me.

[13] Trans. Feb. 19, 2013 at 90:8-11; Debtor's Fourth Amended Disclosure Statement, Docket No. 583 at 5.

[14] The Rental Properties are located at 64 Eaton Street, 68-70 Eaton Street, 74-76 Eaton Street, 106-108 Eaton Street, 114-116 Eaton Street, 118-120 Eaton Street, 140-142 Eaton Street, 144 Eaton Street, 133-135 Radcliffe Street, 345 Hope Street, 57-59 Tyndall Street, and 37-39 Pembroke Street.  The Debtor also owned a thirteenth investment property located at 61 Lucille Avenue in Providence, Rhode Island, but it was foreclosed pre-petition. Debtor's Fourth Amended Disclosure Statement, Docket No. 583 at 8 n.1.

[15] Trans. Feb. 19, 2013 at 89:20-25; 90:1-7.

[16] *See id.* at 90:12-14.

[17] *Id.* at 114-118; Trans. Feb. 20, 2013 at 18-25.  I note that throughout the various pleadings in this case, the Debtor's sister's name is spelled inconsistently as either "Allison" or "Alison."  As it is unclear which is correct, for the sake of consistency, I will use "Allison."

[18] Debtor's Fourth Amended Disclosure Statement, Docket No. 583 at 6.

3805 West Morley Drive in Teton Village, Wyoming as tenants by the entirety.[19]  Both the East

Greenwich, Rhode Island and Teton Village, Wyoming properties were sold during the pendency

of this Chapter 11 proceeding.

In January, 2009, the Debtor formally entered into a master lease agreement with

Jeremiah Nash ("Nash") whereby the Debtor leased the properties located at 74-76 Eaton Street,

106-108 Eaton Street, 144 Eaton Street, 57-59 Tyndall Avenue, 133-135 Radcliffe Avenue, and

143 Radcliffe Avenue, although this last property is titled to Allison Saunders, to Nash with an

option to purchase at a later date.[20]  In exchange, Nash was to sublet the apartments, maintain the

properties, pay all taxes and insurances, and collect rents from the subtenants.[21]  Additionally,

Nash was make yearly rental payments totaling $231,919.44 in monthly installments of

$19,326.62, plus all real estate tax, utility, insurance, maintenance, and capital improvement

payments.[22]  As such, it was a pure triple net lease.[23]

At the confirmation hearing, Nash testified that at the time he began subleasing the

Debtor's properties, he estimates the occupancy rate was only about 30%, which he was able to

increase to approximately 80%.[24]  Nash further testified that he procured leases not only for the

2011 and 2012 rental years, but for the June 2013 through May 2014 year as well.[25]  Although he

did not know how many of his subtenants continue to rent from the Debtor, he estimated that he

---

[19] *Id.*

[20] Trans. Feb. 20, 2013 at 6:11-25; 7:1-8.

[21] *Id.* at 7:22-25; 8:1-6; Trans. Feb. 19, 2013 at 37:23-25; 38:1-3.

[22]  Debtor's Fourth Amended Disclosure Statement, Docket No. 583 at 8.

[23] Trans. Feb. 19, 2013 at 38:13-14.

[24] Trans. Feb. 20, 2013 at 9:5-23.

[25] *Id.* at 10:8-20.  See Feb. 19, 2013 at 159:21-23.

put "roughly 50 percent" of the tenants in those properties.[26]  Based upon his familiarity with the

Providence College area, Nash characterized the rental rates he obtained as above average.[27]

During the same time period, the Debtor entered into a substantially similar master lease

agreement with Peter Folse ("Folse") with respect to 64 Eaton Street, 68-70 Eaton Street, 114-

116 Eaton Street, 118-120 Eaton Street, 140-142 Eaton Street, 37-39 Pembroke Avenue, 61

Lucille Avenue, and 121-123 Radcliffe, although this last property is titled to Allison Saunders.[28]

According to the "Debtor's Fourth Amended Disclosure Statement" (the "Fourth

Amended Disclosure Statement"), the purpose of these master lease agreements was to guarantee

sufficient cash flow from the Rental Properties to pay the mortgage obligations, eliminate the

need for the Debtor to operate them himself, and generate a stream of income for his living

expenses and, ultimately, his retirement.[29]  Things, however, did not go to plan.  While both

Nash and Folse successfully obtained subleases and collected rents from subtenants, neither

remitted the full amount due under the master lease agreements to the Debtor.[30]  Although the

amounts due under the master leases are disputed, the Debtor alleges that both Nash and Folse

owe in excess of $200,000 and $100,000, respectively.[31]

The closing of Greenwich Mortgage, which was the Debtor's primary source of income,

coupled with the breaches of the master lease agreements caused economic strains resulting in

mortgage deficiencies that compelled the Debtor to file the present case.

---

[26] Trans. Feb. 20, 2013 at 11:11-20.

[27] *Id.* at 12:16-20.

[28] Debtor's Fourth Amended Disclosure Statement, Docket No. 583 at 8.

[29] *Id.* at 9.

[30] *Id.* at 8-9; Trans. Feb. 19, 2013 at 37:4-9, 19-25; 38:15-23; Trans. Feb. 20, 2013 at 13:11-24.

[31] Debtor's Fourth Amended Disclosure Statement, Docket No. 583 at 9; Trans. Feb. 20, 2013 at 13:19-24.

B. The Debtor's Bankruptcy Filing

The Debtor filed a skeletal Chapter 11 petition on July 25, 2011.  On August 25, 2011, the Debtor completed his petition by filing, *inter alia*, his schedules, Statement of Financial Affairs, and Statement of Intent.  During the evidentiary hearing, the Debtor testified that while he understood and assisted in the preparation of what he called "application forms" consisting of a forty-six page booklet that included a listing of his properties, liabilities, and creditors, he did not have a good understanding of the terms "schedules," "petition," and "disclosure" as it referred to his bankruptcy.[32]  Indeed, the Debtor testified repeatedly that the term "schedules . . . throws [him] off."[33]

On "Schedule A – Real Property" ("Schedule A"),[34] which has been the focus of a fair amount of scrutiny in this case, the Debtor listed the following properties and values subject to the caveats in their description:

| Description and Location of Property | Value of Debtor's Interest | Amount of Secured Claim |
| --- | --- | --- |
| 3805 W. Morley Dr, Teton Village, Teton, WY Currently listed for sale with Sotheby's International Real Estate.  Asking price $4,395,000. Value is tax assessment value.  Debtor believes actual values are significantly less.[35] | 3,150,000.00 | 1,639,858.00 |
| 5 Pheasant Drive, East Greenwich, RI 02818 - Residence Ann Saunders name only- from beginning. Value is tax assessment value.  Debtor believes actual values are significantly less. | 772,900.00 | 558,000.00 |

---

[32] Trans. Feb. 19, 2013 at 119:16-24; 121:18-25.

[33] *Id.* at 122:1-2; 124:4-25; 126:2-22.

[34] Schedule A, Docket No. 21.

[35] Although listed on Schedule A, the Real Estate Agent's name and telephone number have been omitted from this decision.

6

| | | |
|---|---|---|
| Investment property- 2 family house – 106-108 Eaton Street, Providence, RI<br>Value is tax assessment value.   Debtor believes actual values are significantly less. | 196,000.00 | 114,182.96 |
| Investment property- 2 family house – 114-116 Eaton Street, Providence, RI<br>Value is tax assessment value.   Debtor believes actual values are significantly less. | 187,700.00 | 217,068.48 |
| Investment property- 2 family house – 118-120 Eaton Street, Providence, RI<br>Value is tax assessment value.   Debtor believes actual values are significantly less. | 206,000.00 | 256,939.48 |
| Investment property- 2 family house – 13-15 Suffolk Street, Providence, RI<br>In name of Alison Saunders – Debtor claims equitable title.<br>Value is tax assessment value.   Debtor believes actual values are significantly less. | 127,800.00 | 0.00 |
| Investment property- 2 family house – 57-59 Tyndall Avenue, Providence, RI<br>Value is tax assessment value.   Debtor believes actual values are significantly less. | 150,600.00 | 286,637.48 |
| Investment property- 2 family house – 74-76 Eaton Street, Providence, RI<br>Value is tax assessment value.   Debtor believes actual values are significantly less. | 239,200.00 | 107,091.48 |
| Investment property- 2 family house – 140-142 Eaton Street, Providence, RI<br>Value is tax assessment value.   Debtor believes actual values are significantly less. | 195,200.00 | 224,542.48 |
| Investment property- 3 family house – 121-123 Radcliffe Avenue, Providence, RI<br>In the name of Alison Saunders – Debtor claims equitable title.<br>Value is tax assessment value.   Debtor believes actual values are significantly less. | 187,200.00 | 217,850.00 |
| Investment property- 3 family house – 133-135 Radcliffe Avenue, Providence, RI<br>Value is tax assessment value.   Debtor believes actual values are significantly less. | 200,300.00 | 310,602.48 |
| Investment property- 3 family house – 37-39 Pembroke Avenue, Providence, RI<br>Value is tax assessment value.   Debtor believes actual values are significantly less. | 92,000.00 | 98,341.48 |

| | | |
|---|---|---|
| Investment property- 3 family house – 64 Eaton Street, Providence, RI<br>Value is tax assessment value.  Debtor believes actual values are significantly less. | 381,800.00 | 114,182.96 |
| Investment property- 3 family house – 68-70 Eaton Street, Providence, RI<br>Value is tax assessment value.  Debtor believes actual values are significantly less. | 185,400.00 | 284,336.48 |
| Investment property- Office – 345 Hope Street, Providence, RI<br>Value is tax assessment value.  Debtor believes actual values are significantly less. | 385,000.00 | 107,091.48 |
| Investment property- Raw land – Boston Neck Road, North Kingstown, RI<br>Value is tax assessment value.  Debtor believes actual values are significantly less. | 100,000.00 | 0.00 |
| Investment property- signal [sic] family house – 31 August Street, Providence, RI<br>In the name of Alison Saunders – Debtor claims equitable title.<br>Value is tax assessment value.  Debtor believes actual values are significantly less. | 116,300.00 | 157,203.00 |
| Investment property- signal [sic] family house – 356 Smith Street, Providence, RI<br>In the name of Alison Saunders – Debtor claims equitable title.<br>Value is tax assessment value.  Debtor believes actual values are significantly less. | 124,000.00 | 108,174.00 |
| Investment property- single family house – 143 Radcliffe Avenue, Providence, RI<br>In the name of Alison Saunders – Debtor claims equitable title.<br>Value is tax assessment value.  Debtor believes actual values are significantly less. | 168,000.00 | 187,989.00 |
| Investment property- Single family – 144 Eaton Street, Providence, RI<br>Value is tax assessment value.  Debtor believes actual values are significantly less. | 170,200.00 | 150,000.00 |
| Investment property- Single family – 83 Ford Street, Providence, RI<br>In the name of Alison Saunders – Debtor claims equitable title.<br>Value is tax assessment value.  Debtor believes actual values are significantly less. | 47,700.00 | 105,000.00 |

| | | |
|---|---|---|
| Investment property- Single family – 9445 High Hawk Road, East Greenwich, RI<br>Listed with Coldwell Bankers at $545,000. Debtor's previous residence – currently vacant<br>Value is tax assessment value.  Debtor believes actual values are significantly less. | 545,000.00 | 260,227.00 |

At the confirmation hearing, the Debtor testified that the property values listed were based upon his research of the tax assessor's records and Zillow.com with appropriate reductions based upon his personal experience in the mortgage industry.[36]

Among the issues raised by Schedule A relating to the Debtor's good faith is his inclusion of the Sister Properties despite the fact that he lacked legal title.  At the confirmation hearing, the Debtor explained that:

> Well, I listed them because I've been taking care of them for a number of years, most of which started with -- at the time it started without Allison when my mom became ill and my mom needed a lot of attention. My mom suffers from Alzheimer's. So, you know, Allison was a little frustrated with things in our, you know, in life per se and she just felt overwhelmed with everything. And she just said, look, I got to take care of ma, you know, you take care of -- this is your problem, you handle it, I just -- I don't want anything to do with it, I'm just -- you know, I want to help ma out. And I said, okay, no problem.[37]

Allison similarly testified that when she began caring for their mother on a full time basis in 2009, she, the Debtor, and their brother Kenneth had an informal discussion about the Debtor "getting involved or in [sic] taking over as far as maintaining the properties, making sure what had to be done did get done" while she took care of their mother.[38]  This included the

---

[36] Trans. Feb. 19, 2013 at 127:14-24; 128:12-25; 129:1-23.

[37] Trans. Feb. 19, 2013 at 114:20-25; 115:1-7.

[38] Trans. Feb. 20, 2013 at 20:18-24; 21:9-12.

maintenance of the Sister Properties, collection of rents, and payment of mortgages, utilities, and real estate taxes.[39]

In order to facilitate the Debtor's management of the Sister Properties, she signed the necessary authorizations to allow him to deal directly with her lenders and all mailings went to his office on 345 Hope Street.[40]   While Allison was taking care of their mother, she did not involve herself in the business and did not contribute any funds towards paying the related obligations.[41]   Any funds needed to maintain the Sister Properties came either from the rents the Debtor collected or out of his own pocket.[42]

Allison and the Debtor did not memorialize this arrangement with any written agreements.[43]   To the contrary, both described a very informal conversation.   Allison explained that she did not have any intention of deeding the Sister Properties to the Debtor and expected that she would eventually resume control of them.[44]   Nevertheless, Allison conceded that she does not know the Debtor's understanding of their arrangement.[45]

In contrast, the Debtor credibly testified:

With regard to those six properties I -- you know, my understanding was that Alison, you know, wasn't get any benefit from them at the time. She was more concerned with my mom. She didn't want anything to do with them, that was something I needed to handle, and she just had walked away from them and entrusted them to me. And I took care of them as though they were my own, and like I said in the neighborhood everybody thought they were mine. Everybody

---

[39] *Id.* at 20:25; 21:1-4.

[40] Trans. Feb. 19, 2013 at 115:20-25; Trans. Feb. 20, 2013 at 24:14-18.

[41] Trans. Feb. 20, 2013 at 24:23-25; 25:1-4.

[42] *Id.* at 25:5-9; *see also* Trans. Feb. 19, 2013 at 117:1-6.

[43] Trans. Feb. 20, 2013 at 19:15-18.

[44] *Id.* at 22:22-25; 23:1-5.

[45] *Id.* at 25:19-21.

knew them to be mine. It wasn't, oh, that's Alison's property. It was, no, that's Neil's.

\* \* \*

I felt I -- those are my properties. I felt that she walked away. I'm doing all this work and doing a 100-percent everything and, you know, I didn't expect her to think I'm going to come back and just say they're mine, meaning hers.[46]

In support of including the Sister Properties on Schedule A, the Debtor further explained:

Well, one of the first things that took place when I sat down with [his counsel] Mr. Raskin was you got put down everything you own, anything you have an interest in, and we had talked about clothes I think. We talked about whatever. You got to just -- you got to disclose everything. So I listed those even though the titles weren't in my name. I listed those because I felt I would never want somebody to come back and say I didn't disclose that I had an interest in these properties. So that's what I disclosed, but because they weren't in my name, you know, I stated that they were in Allison's name.[47]

The Debtor later reiterated that when assisting his counsel to complete his schedules, he "gave them every asset [he] owned, everything that could be considered [his]."[48]

All of the Debtor's disclosure statements have all described his understanding with Allison as a promise to convey the Sister Properties to him in exchange for his promise to continue operating them and pay off the promissory notes which they secure.[49]  In the Debtor's Fourth Amended Disclosure Statement, he stated that it had been his hope to make an equitable claim to the Sister Properties under a resulting trust theory under Rhode Island law.[50]  In light of

---

[46] Trans. Feb. 19, 2013 at 116:2-21 (intervening question omitted).

[47] *Id.* at 118:12-23.

[48] *Id.* at 120:20-21.

[49] *See, e.g.,* Debtor's Fourth Amended Disclosure Statement, Docket No. 583 at 7.

[50] *Id.*

his undisputed breach of his promise to pay the mortgages on the Sister Properties and the absence of any written agreement, however, the Debtor has now abandoned this assertion.[51]

C. The Debtor's Initial Reorganization Efforts

The Debtors initial plans of reorganization were premised on a proposed "cram down" of the secured claims encumbering the various investment properties to the actual value of the collateral.  The Debtor filed his first such plan and disclosure statement on February 6, 2012, but withdrew it a month later in anticipation of a lender's objection.  After extensive negotiations with the lenders and the Internal Revenue Service (the "IRS") and a first attempt at a further amended plan, the Debtor filed the "Debtor's Second Amended Plan of Reorganization" (the "Second Amended Plan") and the "Debtor's Amended Disclosure Statement" (the "Second Amended Disclosure Statement") on July 10, 2012.  A hearing on the approval of the Second Amended Disclosure Statement was scheduled for August 23, 2012.

On July 16, 2012, Grant Court Development, LLC ("GCD") filed an objection to the Second Amended Disclosure Statement stating that it did not disclose the existence or adequately describe the treatment of certain real estate tax claims.[52]  GCD otherwise indicated that it agreed to the treatment of its claim as set forth in the Second Amended Plan.[53]  Except as explained in the next section, no other creditor filed an objection to the Second Amended Disclosure Statement.

---

[51] *Id.* at 7-8.

[52] Objection to Approval of Disclosure Statement, Docket No. 376 at ¶ 1.

[53] *Id.* at ¶ 4.

D. The 02908 Club

The 02908 Club is in the business of college student rental housing and in competition with the Debtor.[54]  It owns approximately seventy-five properties, consisting of approximately two hundred units and six hundred beds.[55]  The 02908 Club's properties are in the same general area and are interspersed with the Rental Properties.[56]

The principals of The 02908 Club are Robert McCann ("McCann") and Scott Carlisle ("Carlisle").[57]  The Debtor, McCann, and Carlisle all know each other from working around the same neighborhood.[58]  As discussed below, the Debtor and Carlisle had never met before their meeting on October 5, 2012,[59] while the Debtor and McCann "are not friendly with one another."[60]

On August 16, 2012, The 02908 Club filed two notices of "Transfer of Claim Other Than For Security," indicating that it was the transferee of claims previously held by JMG, Inc. in the amount of $870.50 and Restivo's Heating & Air Conditioning Ltd. in the amount of $425.[61]  On the same date, The 02908 Club filed an objection to the Second Amended Disclosure Statement, asserting that it inadequately explained that unless each of the fourteen impaired classes of creditors accepted the Second Amended Plan, it would not satisfy 11 U.S.C. §

---

[54] *See* Trans. Feb. 19, 2013 at 162:21-23; 163:2-4.

[55] *Id.* at 163:2-11.

[56] *Id.* at 93:4-10; 163:2-11.

[57] *Id.* at 162:19-20.

[58] *Id.* at 89:16-19.

[59] *Id.* at 106:23-25.

[60] *Id.* at 99:21-22; *see id.* at 102:1-3.

[61] *See* Docket Nos. 397, 398.

1129(b)(2)(B)(ii).[62]   Notably, The 02908 Club referred to itself as the "Competing Plan Proponent" in the objection and stated its intention to file a competing plan in which all creditors would be paid in full through a purchase of the Debtor's properties.[63]

E. The October 5, 2012 Meeting

On August 22, 2012, the day before the hearing on the approval of the Second Amended Disclosure Statement, the Debtor filed the first in a series of motions to continue.  The stated grounds for the continuance was to afford counsel to the Debtor and The 02908 Club an opportunity to engage in substantive discussions to resolve The 02908 Club's objection. Notably, the Debtor indicated that resolution of the objection "in all likelihood will result in converting the Debtors [sic] plan from a cram down plan with less than 50% paid to unsecured creditors, to a potential 100% plan, benefitting the entire estate."[64]

Consistent with the representation in the motion to continue, the Debtor testified that after learning that The 02908 Club intended to file a competing plan, he understood that in order to keep his properties, he too would have to propose a plan that contemplated full repayment to his creditors.[65]   To that end, he began researching his options and speaking to various potential investors to gauge their interest.[66]   Concurrent with the discussions with The 02908 Club's

---

[62] Objection to Debtor's Amended Disclosure Statement, Docket No. 399.

[63] Id.

[64] Motion to Continue Hearing Date on Debtor Neil Saunders' Approval of Disclosur [sic] Statement for Two Weeks, Docket No. 403 at ¶ 4.

[65] Trans. Feb. 19, 2013 at 96:8-16.

[66] Id. at 96:17-23.

counsel, Debtor's counsel and Ralph A. Palumbo ("Palumbo"), the Debtor's account, entered negotiations with David Malkin ("Malkin"), the principal of GCD.[67]

At the confirmation hearing, the Debtor testified that despite already having a very strong framework for a proposed full repayment plan with Malkin,[68] he decided that, in the process of exploring his options, it was in his interest to determine whether The 02908 Club might be interested in purchasing the Rental Properties.[69]  The Debtor further explained that he was at that time frustrated with all the professionals and wanted to speak directly to Carlisle in hopes that they might "get to the nuts and bolts" of a deal.[70]  Accordingly, the Debtor sent Carlisle a text message requesting a meeting.[71]  He did not invite McCann because they "are not friendly with each other . . . and [they] . . . in [his] estimation . . . wouldn't make any progress."[72]

Carlisle testified that although he did not specifically know why the Debtor wanted to meet with him, he presumed that it was to discuss a potential sale of the Rental Properties.[73]  Carlisle discussed the proposed meeting with McCann and his attorney, Steven Brusini ("Attorney Brusini"), and agreed to meet.[74]  The Debtor and Carlisle agreed to meet on October 5, 2012, at the Panera Bread restaurant in Cranston, Rhode Island.[75]

---

[67] *Id.* at 97:2-7.

[68] *Id.* at 98:2-8.

[69] *Id.* at 98:22-25; 98:1.

[70] *Id.* at 98:19-25; 99:1-12.

[71] *Id.* at 98:12-18; 174:17-19; 184:3-7.

[72] *Id.* at 99:21-24.

[73] *Id.* at 185:1-7.

[74] *Id.* at 185:8-24; 186:12-16; 187; 188:1-9.

[75] *Id.* at 99:13-18; 174:14-16; 184:11-13.

Both testified that an initial exchange of pleasantries,[76] "[t]he meeting . . . kicked off with Neil commenting about the 1880s and if this were the 1880s and Bob had pulled this he would have settled matters the old fashioned way."[77]  At the confirmation hearing, the Debtor explained that he is a western movie buff and his situation reminded him of the villainous land barons depicted in those movies who push their way into town only to be run out by the townsfolk.[78]  He testified that the statement was meant to break the ice and was followed by "a chuckle and laughter."[79]

After this opening, the meeting segued into Debtor discussing the background of his bankruptcy.[80]  According to the Debtor's testimony, he told Carlisle that he had found an equity partner in order to propose his own full repayment plan.[81]  The Debtor then explained that if he was already giving up some equity to a partner, it made sense to explore sale options with Carlisle and McCann.[82]

At this point, Carlisle's account of the meeting diverges substantially.  Carlisle testified that the Debtor made him a proposal that he "really didn't understand."[83]  After several attempts to explain his proposal, Carlisle testified that the Debtor advised him not to file a competing plan

---

[76] *Id.* at 99:25; 100: 1-2; 174:20-23.

[77] *Id.* at 174:23-25; 175:1-2; *see also id.* at 100:9-13.

[78] *Id.* at 100:14-25; 101:1-2.

[79] *Id.* at 101:3-8.

[80] *Id.* at 175:2-5.

[81] *Id.* at 102:7-12.

[82] *Id.* at 102:12-22.

[83] *Id.* at 175:6-8.

and allow him to continue with his cram down plan as the creditors had already agreed to it.[84]  In return, the Debtor stated he would sell the properties to Carlisle post-bankruptcy and they would "share the savings."[85]  Carlisle repeatedly questioned whether such an arrangement was legal, which, after some pressing, the Debtor admitted it his counsel previously informed him that it might not be appropriate.[86]  In response, Carlisle informed the Debtor that he would not do anything to hurt his professional reputation.[87]

At the confirmation hearing, the Debtor testified that Carlisle's statements regarding his alleged offer to collude were "absolutely false."[88]  By way of explanation, the Debtor stated that "[t]here was no turning back from a 100-percent plan. There was nothing to collude with."[89]  He further testified that:

> The only discussion that was there was, hey, if you want to purchase these properties this is an opportunity to discuss it with me to purchase the property and it was as people well know now at a significant price point that I felt as though was good for the estate, could pay the bills, could satisfy myself and my wife, you know, taking care of my family.[90]

The Debtor also denies that he suggested that the 02908 Plan be withdrawn, but asserts that Carlisle mentioned it at the meeting.[91]

---

[84] *Id.* at 175:19-25.

[85] *Id.* at 176:1-2.

[86] *Id.* at 176:3-8.

[87] *Id.* at 176:9-15.

[88] *Id.* at 103:5-23; 133:11-17.

[89] *Id.* at 103:21-23.

[90] *Id.* at 104:6-11.

[91] *Id.* at 104:21-25.

Although the parties do not agree on how they got there, the conversation then transitioned into a lengthy discussion of McCann, whom the Debtor feels is unethical.[92]  The Debtor testified that Carlisle responded by accusing him of unethically cheating the banks based upon his proposed cram down in the Second Amended Plan.[93]

After concluding their discussion of relative ethics, the Debtor showed Carlisle a spreadsheet (the "Spreadsheet") he prepared purporting to show the values and projected annual revenue of some of the Rental Properties and the Sister Properties.[94]  At the confirmation hearing, the Spreadsheet was admitted into evidence as Creditor's Exhibit 2.  The values reflected on the Spreadsheet are as follows:[95]

| Property | Value |
|---|---|
| 64 Eaton Street | $1,125,000 |
| 68-70 Eaton Street | $625,000 |
| 74-76 Eaton Street | $500,000 |
| 106-108 Eaton Street | $500,000 |
| 114-116 Eaton Street | $562,500 |
| 118-120 Eaton Street | $562,500 |
| 140-142 Eaton Street | $375,000 |
| 144 Eaton Street | $375,000 |
| 121-123 Radcliffe Avenue | $500,000 |
| 133-135 Radcliffe Avenue | $625,000 |
| 143 Radcliffe Avenue | $375,000 |
| 57-59 Tyndall Avenue | $437,500 |
| 37-39 Pembroke Avenue | $500,000 |
| 31 August Street | $250,000 |
| 356 Smith Street | $250,000 |
| **Total:** | **$7,562,500** |

---

[92] *Id.* at 176:16-23; 105:2-13.

[93] *Id.* at 105:2-13.

[94] *Id.* at 106:1-6; 177:12-14.

[95] Creditor's Ex. 2.

The Debtor testified that for any sale to a competitor, he would need to get enough equity out of the sale to live and retire on.[96]  The Spreadsheet did not provide any information as to what the properties would be worth if the Second Amended Plan was confirmed in the absence of any competing plans.[97]

The Debtor explained to Carlisle how he calculated these values and the corresponding rent projections.[98]  While Carlisle testified that "Mr. Saunders seems to have a really deep understanding of what would pay for certain properties,"[99] he thought the values were "outrageously high."[100]  Carlisle based this opinion off his experience with the seventy-five properties that he currently manages and his understanding of the cash flow value reflected, which he believed was substantially higher than anything that was reasonable.[101]

The Debtor testified that as he was explaining the Spreadsheet, Carlisle was nodding, but appeared to have no real interest.[102]  While Carlisle opined that The 02908 Club would pay more than anyone else for the properties based upon their existing holdings, Carlisle testified that in light of the values offered by the Debtor, they were so far apart that there was no way they could negotiate.[103]  As such, Carlisle's counteroffer was "hey, you got money, buy us out," suggesting an acquisition price of The 02908 Club's holdings in excess of $40 million dollars based on the

---

[96] Trans. Feb. 19, 2013 at 102:23-25; 103:1-4.

[97] *Id.* at 190:9-15.

[98] *Id.* at 110:9-17; 177:15-25; 178:1-2.

[99] *Id.* at 177:21-22.

[100] *Id.* at 178:3-6.

[101] *See id.* at 178:19-23.

[102] *Id.* at 111:3-9.

[103] *Id.* at 179:1-23; 192:15-21.

Debtor's valuation method.[104]   Carlisle testified that the Debtor then informed him that he had

made a "strategic mistake" by not approaching him before filing a competing plan because they

would now end up paying more for the properties.[105]   He further testified that the Debtor began

boasting that his private investor that would outbid any offer made by The 02908 Club because

the excess of the bid would be funneled back to the private investor.[106]   The Debtor's testimony,

on either direct or cross-examination, is devoid of any mention of these boasts.

> At the confirmation hearing, Carlisle described the end of the meeting as follows:

> At this point Neil strung together what I considered to be a number of very
> unusual comments. You know, basically what he said is people had advised him
> that if Bob had done this to them that he –- they would have shot him in the back
> of the head and this is what Neil would do. He also said that he goes to sleep
> thinking about Mr. McCann, he wakes up in the middle of the night thinking
> about Mr. McCann, and he wakes up in the morning thinking about Mr. McCann.
> He also went on to say honestly that if he lost his three or four million in
> retirement from his properties he's not sure what he'd be capable of. And lastly,
> and this is really kind of how the meeting ended was he said my family and I
> should be careful about doing business with Mr. McCann.  You know, at that
> point I told Neil, you know, his statements were upsetting me, you know, we kind
> of had to end the meeting, and at that point really the meeting, you know,
> ended.[107]

The Debtor concedes only that he said one person told him that if "this," presumably meaning

the competing plan and the contemplated forced liquidation, happened to them, they would put a

bullet in McCann's head.[108]   He also admits that he warned Carlisle about doing business with

McCann, but denied the remaining allegations.[109]   While testifying, the Debtor appeared

---

[104] *See id.* at 181:1-10; *see also id.* at 111:12-15.

[105] *Id.* at 180:1-7.

[106] *Id.* at 180:8-17; 181:11-18.

[107] *Id.* at 182:12-25; 183:1-2.

[108] *Id.* at 106:7-17; 131:3-14.

[109] *See id.* at 108:8-14.

particularly upset by the allegation that he would have even used the word "family" in his discussion with Carlisle, explaining that "you don't do that in business."[110]  The Debtor further testified that he neither knew if Carlisle had a family, nor uses violent or threatening statements while negotiating with people.[111]

The Debtor believes the meeting took between forty-five minutes to an hour and a half, while Carlisle believes it took very close to an hour and a half.[112]  Carlisle testified that he left the meeting feeling threatened and uncomfortable.[113]  He did not, however, inform anyone other than his wife, McCann, and Attorney Brusini that he felt threatened.[114]  After the meeting, Carlisle sent an email to Attorney Brusini memorializing the conversation he had with the Debtor, as was his intention before he went to the meeting.[115]  He then discussed the meeting with McCann, and they ultimately decided to move forward with the competing plan.[116]

F. Allegations of Bad Faith and Dual Track Towards Confirmation

After several continuances, I held a hearing on the approval of the Second Amended Disclosure Statement on September 27, 2012.  By this point, the Debtor had filed a response to The 02908 Club's objection contending that its purpose was simply to confuse the creditors and thwart the success of the Second Amended Plan so that The 02908 Club could obtain a

---

[110] *Id.* at 107:20-24; 135-136.

[111] *Id.* at 108:1-4; 136:10-12.

[112] *Id.* at 100:3-6; 182:8-11.

[113] *Id.* at 193:6-11.

[114] *Id.* at 190:22-25; 191:1-6; 195:1-11.

[115] *Id.* at 189:1-18.

[116] *Id.* at 197:2-12.

monopoly.[117]   At the hearing, Counsel to GCD represented that pending amendments to the

Second Amended Disclosure Statement would address GCD's concerns and allow it to withdraw

its objection.   As such, I scheduled a hearing on the approval of a further amended disclosure

statement on October 23, 2012.   I further ordered The 02908 Club to file its proposed plan and

disclosure statement within sufficient time to allow for a combined hearing.

On October 16, 2012, the Debtor filed the "Debtor's Third Amended Plan of

Reorganization" (the "Third Amended Plan") and the "Debtor's Third Amended Disclosure

Statement" (the "Third Amended Disclosure Statement"), while The 02908 Club filed a

competing plan and disclosure statement.   Unlike the Debtor's prior plans, the Third Amended

Plan contemplated full repayment of all creditors by virtue of an equity investment by Malkin.

On the same date, the Debtor moved for an order approving the Third Amended Disclosure

Statement and the Third Amended Plan reasoning that in the absence of an impaired class, all

creditors are conclusively presumed to have accepted the plan.[118]

On October 19, 2012, The 02908 Club filed a response to the Motion to Approve arguing

that the Third Amended Plan should be disqualified under 11 U.S.C. § 1129(a)(3) because the

Debtor acted in bad faith and by means forbidden by law in proposing his plan.[119]   In support,

The 02908 Club attached an affidavit of Carlisle wherein he stated that on October 5, 2012, the

Debtor tried to convince him not to file a competing plan and conveyed threats to him and

---

[117] Reply of Debtor Neil Saunders to Objection of 02908 Club, LLC's Objection to the Disclosure Statement Filed by Debtor, Docket No. 424 at 4.

[118] Motion to Approve Plan of Debtor Neil H. Saunders As There Are No Classes of Impaired Creditors and Voting is Not Required (the "Motion to Approve"), Docket No. 483 at ¶ 2.

[119] Response To Debtor's Motion to Approve Chapter 11 Plan and 02908 Club Holdings, LLC's Conditional Motion for a Scheduling Order, Docket No. 490 at ¶ 5.

McCann.[120]  As such, The 02908 Club requested that I not act on the Motion to Approve until I

first consider the approval of each party's disclosure statement, taking into consideration

Carlisle's allegations.[121]

     In response to Carlisle's affidavit, the United States Trustee filed a motion to appoint a

Chapter 11 trustee on October 22, 2012.  In the motion, the United States Trustee asserted that if

the allegations of the Carlisle affidavit are true, cause existed for the appointment of a Chapter

11 trustee, including fraud, dishonesty, and gross mismanagement.[122]  In light of the United

States Trustee's Motion, I continued the hearing on the competing disclosure statements, as well

as the Motion to Approve, to November 13, 2012 so that they could be heard in conjunction with

the motion to appoint a Chapter 11 trustee.

     An examination of the Debtor pursuant to Fed. R. Bankr. P. 2004 was held on November

1, 2012.[123]  At his examination, the United States Trustee showed the Debtor Schedule A and

asked him if he had ever seen it before, to which he replied, "no."[124]  At the confirmation

hearing, the Debtor testified that he mistakenly answered "no" because he was confused by the

term "schedule" and had not seen the document since August of 2011.[125]  He further stated:

> It was just a simple mistake. I didn't realize Schedule A and then I -- it had been a
> year. I -- there's so many forms here. There's thousands of pages. It just didn't
> equate with me, and I don't refer to this as a Schedule A. I know it says that, but it
> -- I just made a mistake.

---

[120] *Id.  See* Affidavit of Scott Carlisle, Docket No. 490-1.

[121]  Response To Debtor's Motion to Approve Chapter 11 Plan and 02908 Club Holdings, LLC's Conditional
Motion for a Scheduling Order, Docket No. 490 at ¶ 7.

[122] Motion of the United States Trustee for the Appointment of a Chapter 11 Trustee, Docket No. 495 at ¶ 17.

[123] Trans. Feb. 19, 2013 at 123:22-24; 125:2-3.

[124] *Id.* at 124:10-20.

[125] *Id.* 124:20-25; 125:1-4.

I spent hours in Mr. Raskins' office, you know, search -- I went to city hall searching tax bills. I pulled together bank statements, mortgage statements that were coming to Hope Street address, to my home address. I pulled this all together and I worked hard on this. I'm not proud of being in bankruptcy, but I worked hard to get the proper information here.

I don't -- I hope not to get hung about it -- hung up on it, but I made mistake because I didn't answer a question properly. I just don't refer to this as a Schedule A. Schedule A to me I think of something completely different.[126]

Somewhat similarly, the Debtor testified at his examination that he had not seen his Third Amended Plan and its exhibits before it was filed, but clarified at the confirmation hearing that he simply had not seen the final version before it was filed and was otherwise aware of the information contained therein.[127]

The Debtor was also questioned with respect to conflicting values he has assigned to his properties throughout this case.  By way of example, the following table lists the disparate values of the Rental Properties and their context:

| Property | Schedule A | Spreadsheet | 3rd/4th Amended Disclosure Statement |
|---|---|---|---|
| 64 Eaton Street | $381,800 | $1,125,000 | $200,000 |
| 68-70 Eaton Street | $185,400 | $625,000 | $150,000 |
| 74-76 Eaton Street | $239,200 | $500,000 | $175,000 |
| 106-108 Eaton Street | $196,000 | $500,000 | $150,000 |
| 114-116 Eaton Street | $187,700 | $562,500 | $150,000 |
| 118-120 Eaton Street | $206,000 | $562,500 | $150,000 |
| 140-142 Eaton Street | $195,200 | $375,000 | $155,000 |
| 144 Eaton Street | $170,200 | $375,000 | $125,000 |
| 133-135 Radcliffe Avenue | $200,300 | $625,000 | $160,000 |
| 57-59 Tyndall Avenue | $150,600 | $437,500 | $135,000 |
| 37-39 Pembroke Avenue | $92,000 | $500,000 | $155,000 |
| **Total:** | **$2,204,400** | **$6,187,500** | **$1,705,000** |

---

[126] *Id.* at 126:1-22.

[127] *Id.* at 139:16-20.

In summary, the Debtor indicated he did not believe the appraiser's values of the Rental Properties reflected in the Third Amended Disclosure Statement were an accurate fair market value because they differed from the way he valued them.[128]

Ultimately, the Debtor filed an opposition to the United States Trustee's motion to appoint a Chapter 11 trustee, while The 02908 Club filed a joinder.  On November 13, 2012, after hearing oral argument from all interested parties, I concluded that given the facts and procedural posture of this case, specifically, that two 100% plans had been proposed and were ready to be sent out, the appointment of a Chapter 11 trustee would be inappropriate at that stage even if Carlisle's allegations proved true.  Nevertheless, I again continued the hearing on the competing disclosures statements to allow The 02908 Club time to obtain and review documents previously requested from the Debtor in order to adequately disclose the tax consequences of their plan.

On December 12, 2012, the Debtor filed the Fourth Amended Disclosure Statement and the Debtor's Plan.  The following day, The 02908 Club filed the "Third Amended Chapter 11 Disclosure Statement (submitted by The 02908 Club Holdings, LLC)" (the "02908 Disclosure Statement") and the 02908 Plan.  The substance of these plans will be discussed in detail below. At a hearing held on January 7, 2013, I ultimately approved both disclosure statements over the Debtor's objection and scheduled an evidentiary hearing with respect to the confirmation for February 19 and 20, 2013.

On January 11, 2013, the parties filed a Joint Emergency Petition for Instructions requesting a ruling on the appropriateness of sending "Plan Preference Forms" to unimpaired creditors so that they may indicate whether they have a preference between the two competing

---

[128] Trans. Feb. 19, 2013 at 142-145.

plans.  On January 16, 2013, I issued a Memorandum of Decision and separate order approving

the use of the plan preference forms and finding that the Debtor is impaired under the 02908

Plan.[129]

On February 12, 2013, the parties filed their respective objections to each other's plans,

as well as their Chapter 11 Worksheets, Schedule of Plan Preference Votes, and Report on

Ballots.  The parties also filed three stipulations through which they agreed to certain findings

under 11 U.S.C. § 1129 with respect to each plan and the non-applicability of the plan preference

forms to a non-creditor class under the Debtor's Plan.  I held a two-day evidentiary hearing on

confirmation on February 19, 2013 and February 20, 2013, at which time the Debtor, Carlisle,

Palumbo, Nash, and Allison Saunders testified.  At the conclusion of the hearing, I took the

matter under advisement and afforded the parties an opportunity to file briefs, which they did on

March 6, 2013.

G. <u>The Debtor's Plan</u>

In summary, the Debtor proposes to effectuate his plan by forming Red Door Realty,

LLC ("Red Door"), a Delaware limited liability company authorized to do business in Rhode

Island in which he will have a 66.67% equity interest, and capitalizing it with $1,000,000 from

the debtor-in-possession accounts, $200,000 from the personal accounts of his wife, Ann

Saunders, and a loan in the amount of $2,622,000 from Malkin in exchange for a 33.33% equity

interest in Red Door (the "Malkin Loan").  The Malkin Loan consists of two components: (1)

Red Door will deliver a promissory note to GCD and assume the principal balance due from the

estate as of the effective date in full satisfaction of the claim; and (2) Malkin will advance

additional funds in the amount of $1,249,466.63 to Red Door.  Red Door will then pay all

---

[129] *In re Saunders*, No. 11-12960-WCH, Slip Op. (Bankr. D.R.I. Jan. 16, 2013).

outstanding claims in full.[130]  Additionally, the Debtor receive an employment contract from Red

Door with compensation in the amount of $120,000 per year for an eight year period and subject

to annual renewal thereafter.[131]

The Debtor's Plan classifies claims and equity interests into seventeen classes.[132]  Class

A consists of administrative expense claims, including the fees of the Debtor's counsel, the court

approved accountants, DiGennaro & Palumbo LLP, and the United State Trustee's quarterly

fees.[133]  The Debtor's Plan contemplates that the all allowed but unpaid professional fees shall be

paid in full from the cash on hand in the debtor-in-possession accounts on the date of

confirmation.[134]  Any claims not payable before confirmation shall be paid when due subject to

Court approval.[135]  The Debtor is current with his quarterly fees, but to the extent that any further

fees become due, they will be paid in full upon the Effective Date of the Plan.[136]  Accordingly,

Class A is unimpaired and is deemed to have accepted the Debtor's Plan.

Class B is made up of claims entitled to priority under 11 U.S.C. § 507(a)(3), (4), (5), (6),

and (8) which are undisputed and remain unpaid at confirmation.[137]  Both the IRS and the Rhode

Island  Division  of  Taxation  ("RIDOT")  had  filed  claims  for  estimated  taxes,  interest,  and

---

[130] In various places, the Debtor's Plan appears inconsistent regarding whether the payor of certain classes will be the Debtor or Red Door with funds supplied from the debtor-in-possession accounts.  Imprecision aside, the funds are the same whether or not they pass through an new entity.

[131] The Debtor's Plan, Docket No. 582 at 14.

[132] *Id.* 582 at 4-8.

[133] *Id.* at 8-9.

[134] *Id.*

[135] *Id.*

[136] *Id.* The "Effective Date" of the Debtor's Plan is defined as the "thirtieth day after the Order approving or confirming the Plan becomes final and non-appealable."  *Id.* at 2.

[137] *Id.* at 4-5.

penalties arising from the Debtor's failure to file returns timely.[138]  The Debtor disputed these claims and has since filed all outstanding tax returns reflecting no tax due and exhibiting large loss carry forwards in excess of $1,600,000.00.[139]  On February 19, 2013, I sustained the Debtor's objection to the RIDOT claim and the IRS agreed to amend its claim to reflect a zero balance.[140]  At present, there are no outstanding tax claims, but the Debtor's tax return for 2011 is currently being examined.[141]  In the event that a tax is due, the Debtor believes that it will be eliminated by the large loss carry forwards.[142]  Otherwise, such a claim would be paid over a five year period.[143]

Class C consists of solely of GCD.[144]  As previously stated, Red Door will deliver a promissory note to GCD on the Effective Date which will be secured by first position mortgages and collateral assignments of leases and rents with respect to all the Rental Properties.[145]  The amount of the note will be the outstanding amount of GCD's secured claim, plus the principal amount of any additional loan to Red Door.[146]  Class C is impaired, but GCD has voted to accept the Debtor's Plan.[147]

---

[138] *Id.*

[139] *Id.*

[140] Trans. Feb. 19, 2013 at 4-6.

[141] *Id.*

[142] *Id.* at 6:13-18.

[143] The Debtor's Plan, Docket No. 582 at 5.

[144] *Id.*

[145] *Id.* at 9-10.

[146] *Id.*

[147] Report on Voting Ballots, Docket No. 647-1 at 35.

The claims of the mortgagees of the Rental Properties are identified in Classes D through N.[148]  Red Door will pay these claims in full within fifteen business days following the Effective Date of the Debtor's Plan, if not earlier.[149]  Accordingly, Classes D through N are unimpaired and are deemed to have accepted the Debtor's Plan.

Class O includes all general unsecured claims.[150]  Red Door will pay these claims in full with interest at the federal rate of interest from the petition date, July 25, 2011, within five business days of the Effective Date.[151]  Class O is unimpaired and is deemed to have accepted the Debtor's Plan.

Class P consists of a claim filed by Robert D. Spickler, Inc., an unperfected tax sale purchaser of the property located at 345 Hope Street in Providence, Rhode Island.[152]  While the Debtor disputes that this claimant is secured in light of the tax collector's deed having been filed after the petition date, the Debtor agrees with the amount of the claim and will pay it within five business days of the Effective Date.[153]

Class Q represents the Debtor's equity interest in the Rental Properties.[154]  Under the Debtor's Plan, he will be issued 66.67% of the total outstanding and membership interests in Red Door.[155]  This class is impaired, but the Debtor has voted to accept the Debtor's Plan.[156]

---

[148] The Debtor's Plan, Docket No. 582 at 5-7.

[149] *Id.* at 9-10.

[150] *Id.* at 7.

[151] *Id.* at 10.  I note that the Debtor's Plan erroneously states that the petition was filed on July 28, 2011.

[152] *Id.* at 7.

[153] *Id.* at 7-8.

[154] *Id.* at 8.

[155] *Id.* at 10.

Finally, Class R includes all the interests of the lessee's under all the rental agreements and between Saunders and the Class R claimants.[157]   The Debtor and Red Door will assume all the leases and with them, all liabilities and obligations thereunder pursuant to 11 U.S.C. § 1123(b)(2).[158]   Class R is unimpaired and is deemed to have accepted the Debtor's Plan.

The following tables are taken from the Pro Forma Disbursement of Plan Funding Proceeds introduced into evidence by the Debtor as Debtor's Exhibit B.  The first table indicates the source of all sums necessary to fund the Debtor's Plan.[159]

| Source of Funds to Fund the Debtor's Plan | Amount |
|---|---|
| Equity by Debtor from DIP Accounts | $1,000,000.00 |
| Loan Proceeds from David Malkin | $1,249,467.00 |
| Additional Funds from Ann Saunders | $200,000.00 |
| Grant Court Loan Conversion/Refinance | $1,372,533.00 |
| **Total Proceeds to Fund Plan** | **$3,822,000.00** |

The next table reflects the payoff figures for each of the secured loans and how the disbursement from Red Door will be applied.[160]

---

[156] Report on Voting Ballots, Docket No. 647-1 at 35.

[157] The Debtor's Plan, Docket No. 582 at 8.

[158] *Id.* at 11.

[159] Debtor's Ex. B.

[160] *Id.*

| Purchased Properties | Principal | Arrearage | Total Payoff | Creditor |
|---|---|---|---|---|
| 64 Eaton Street | | | $1,357,533.37 | GCD |
| 74-76 Eaton Street | | | - | GCD |
| 106-108 Eaton Street | | | - | GCD |
| 345 Hope Street | | | - | GCD |
| 68-70 Eaton Street | $248,697.00 | $21,665.00 | $270,362.00 | Bank of America |
| 68-70 Eaton Street | $28,550.00 | $1,572.00 | $30,122.00 | Bank of America |
| 114-116 Eaton Street | $209,978.00 | $34,004.00 | $243,982.00 | One West Bank |
| 118-120 Eaton Street | $249,848.00 | $86,941.30 | $336,789.30 | Bank of America |
| 140-142 Eaton Street | $217,451.65 | $85,465.13 | $302,916.78 | Bank of America |
| 144 Eaton Street | $150,000.00 | $32,500.00 | $182,500.00 | Gray Johnson |
| 133-135 Radcliffe Avenue | $237,818.00 | $112,140.00 | $349,958.00 | Bank of America |
| 57-59 Tyndall Avenue | $220,269.00 | $83,082.00 | $303,351.00 | Bank of America |
| 37-39 Pembroke Avenue | $90,852.00 | $12,962.00 | $103,814.00 | Ocwen Finance |
| **Subtotal of Secured Claims** | | | $3,481,328.45 | |
| **Total of Unsecured Claims** | | | $110,000.00 | |
| **Total Administrative Claims (estimated)** | | | $200,000.00 | |
| **Total Amount Necessary to Fund 100% Plan** | | | $3791,328.45 | |
| **Cash Due from Red Door Realty, LLC** | | | $3,822,000.00 | |
| **Net Cash Due to the Buyer** | | | $30,671.55 | |

At the confirmation hearing, Palumbo, the Debtor's accountant, described the proposed the Debtor's Plan as essentially a refinance transaction.[161]   Moreover, he explained that despite the conveyance to Red Door, the transaction would not result in any tax liability due to common ownership.[162]   The Debtor testified that he proposed the Debtor's Plan

> because it was a way that I would be able to pay off everybody I owed money to and I'd be able to continue with what I've been doing. And the only thing that I really know, that I'm able to do right now, based upon the background I have. And I just feel it's the best option for me based upon my experience and my situation.[163]

---

[161] Trans. Fed. 19, 2013 at 61:18-25.

[162] *Id.* at 62:14-17.

[163] *Id.* at 88:12-19.

Palumbo testified extensively with respect to the feasibility of the Debtor's Plan at the confirmation hearing.  By way of background, Palumbo graduated from Byant College with a Bachelor of Science in Business Administration with a major in accounting in 1985.[164]  He has been a certified public accountant since 1988, and is also a certified internal auditor "under Series 7 and Series 66, investment advisory consultant."[165]

After graduating college, Palumbo went to work with an accounting firm in Providence and for three or four years practiced primarily in real estate, real estate development, rentals, HUD audits, and construction audits.[166]  During this period he did approximately twenty to thirty audits a year involving large residential rental projects with HUD loans and subsidized tenants.[167]  Palumbo then spent three years with the Boston Edison Company as a certified internal auditor focusing on construction and real estate financial statement auditing.[168]  In this capacity, he regularly performed revenue tests to verify leases with HUD projects and other commercial work.[169]

In the early 1990's, Palumbo opened his own practice emphasizing his expertise in real estate and construction projects.[170]  This has involved a lot of insolvency work in the bankruptcy

---

[164] *Id.* at 28:20-23; 29:8-9.

[165] *Id.* at 28:17-19; 29:1-2.

[166] *Id.* at 29:5-16.

[167] *Id.* at 30:3-6.

[168] *Id.* at 29:14-23.

[169] *Id.* at 30:13-20.

[170] *Id.* at 30:21-25; 31:1-5.

court and state court receiverships, as he is often retained regarding financial and tax matters in

cases where there is continued operation.[171]  At the confirmation hearing, Palumbo explained:

> I'm usually brought in by a receiver to come in and make sure that there's proper
> set of books, there's a proper accounting system, there's a property -- a proper
> assembly and accounting of assets and, you know, monthly or weekly cash flows,
> depending on what's needed, cash tracking, asset tracking. And typically, a lot of
> time that's done with a very close relationship with the existing management
> and/or ownership of that entity that's in an insolvency matter.[172]

In the present case, Palumbo was engaged to assist in preparing past due tax returns from

the year 2006 to present, address some outstanding IRS assessments, help with accounting, and

set up an accounting and reporting system to prepare the monthly operating reports for the

United States Trustee.[173]  He and his staff prepared monthly operating reports by collecting

source documents, such as bank records and statements, and summarizing them into a report.[174]

Palumbo testified that using the bank statements, he was able to track cash coming into the estate

from the Debtor's rental operations.[175]

Having had an ample opportunity to observe the Debtor's business operations, Palumbo

testified that when he was first engaged, the business was in disarray.[176]  Among the problems he

identified was the master lease agreement with Nash.[177]  Palumbo discovered that the amounts

due under the master lease were being paid sporadically at best and in amounts less than agreed

---

[171] *Id.* at 31:6-24.

[172] *Id.* at 32:5-12

[173] *Id.* at 33:4-11.

[174] *Id.* at 34:1-8.

[175] *Id.* at 35:5-9.

[176] *Id.* at 34:14-19; 37:1-4.

[177] *Id.* at 37:4-5, 19-25.

upon.[178]   Moreover, because Nash had enticed subtenants with discounts for advanced payment

on some leases, the units remained occupied during the bankruptcy but no rents were able to be

collected for the estate.[179]

Palumbo testified that during the Chapter 11 process, he was able to help the Debtor

implement several changes to his business model that have improved operations.[180]   The first

step was to eliminate the master lease in order to take control of a substantial part of the Debtor's

portfolio and lease the properties out to tenants that were more dependable in making

payments.[181]   The next step was to set up a proper communication and accounting systems to

enable the Debtor to collect, assemble, and report all his financial information.[182]   Third, there

was a concerted effort to change the Debtor's approach to renting units in order to obtain firmer

payment standards, such as parental guarantees and equal monthly payments, as opposed to the

unsteady income stream generated by the prior leases that did not require equal monthly

installments.[183]   With this foundation, the Debtor was better able to implement regular repairs

and maintenance, which in turn reduced the number of vacancies.[184]

In further support of the Debtor's Plan, the Debtor introduced into evidence a pro forma

five year cash flow projection.[185]   Palumbo testified that he worked closely with the Debtor to

---

[178] *Id.* at 38:15-23.

[179] *Id.* at 42:1-13.

[180] *Id.* at 40:14-25.

[181] *Id.* at 39:3-17.

[182] *Id.* at 39:18-22.

[183] *Id.* at 35:13-25; 36:1-21; 40:3-8.

[184] *Id.* at 40:8-13.

[185] Debtor's Exhibit A.

prepare this cash flow statement during the fourth quarter of 2012.[186]   Generally, in projecting

future cash flow, he used year one as a baseline and applied modest incremental increases to the

rental operations.[187]

At the confirmation hearing, Palumbo explained the methodology used to calculate the

revenue projections:

> We listed the -- each property, both for the rental or revenue side -- rent to
> revenue side and both -- each property for the rental expense side. To come up
> with the operating cash flow or what we call in the accounting world pre-debt
> service cash flow.
>
> And so we took -- had evaluated each property, considered the history of the
> property, considered the gross potential rent which is simply the number of units
> for that particular property times what we think would be a reasonable rent. Or for
> each bedroom of that property times the 12 months and you got a gross potential
> rent.
>
> And then took into consideration historical factors for vacancy, for non-payment
> and other items that would impair rental revenue to reflect it under what I would
> say would be an achievable and/or somewhat of a conservative presentation on
> the revenue side. And simply put I would like to use just round numbers so it just
> doesn't -- we don't get hairsplitting. But, the gross potential is approximately
> $700,000 for the rental units that are presented here.[188]

Palumbo explained that the "gross potential" of the Rental Properties was derived by multiplying

the total number of units, ninety-eight, by twelve months, and then multiplying that number by

the average rent, which in this case was $585.[189]   He then made a reduction of approximately

---

[186] Trans. Feb. 19, 2013 at 43:9-18.  Despite having prepared the cash flow projections, Palumbo testified that
Debtor's Exhibit A appears to be a reproduction of the original cash flow projection document he prepared as the
exhibit contains arithmetic errors.  *See* Trans. Feb. 19, 2013 at 79:2-24.  I have examined Debtor's Exhibit A and
discovered several additional minor errors with respect to the subtotals reflected.  As they are non-material, I have
simply corrected them in my reproductions of Debtor's Exhibit A.

[187] *Id.* at 50:6-9.

[188] *Id.* at 44:20-25; 45:1-10.

[189] *Id.* at 45:14-22.

15% to the rents to account for "for things that happen, vacancy, just non-payment . . ."[190]  The

following table shows the projected revenue of the Rental Properties for the next five years.[191]

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Totals |
|---|---|---|---|---|---|---|
| 64 Eaton St. | $132,000.00 | $134,640.00 | $137,333.00 | $140,079.00 | $142,881.00 | $686,933.00 |
| 68-70 Eaton St. | $51,307.00 | $52,333.00 | $53,380.00 | $54,447.00 | $55,536.00 | $267,003.00 |
| 74-76 Eaton St. | $46,761.00 | $47,696.00 | $48,650.00 | $49,623.00 | $50,616.00 | $243,346.00 |
| 106-108 Eaton St. | $36,305.00 | $37,031.00 | $37,772.00 | $38,527.00 | $39,298.00 | $188,933.00 |
| 114-116 Eaton St. | $46,761.00 | $47,696.00 | $48,650.00 | $49,623.00 | $50,616.00 | $243,346.00 |
| 118-120 Eaton St. | $61,500.00 | $62,730.00 | $63,985.00 | $65,264.00 | $66,570.00 | $320,049.00 |
| 140-142 Eaton St. | $45,000.00 | $45,900.00 | $46,818.00 | $47,754.00 | $48,709.00 | $234,181.00 |
| 144 Eaton St. | $41,600.00 | $42,432.00 | $43,281.00 | $44,146.00 | $45,029.00 | $216,488.00 |
| 133-135 Radcliffe St. | $59,000.00 | $60,180.00 | $61,384.00 | $62,611.00 | $63,863.00 | $307,038.00 |
| 345 Hope St. | $4,200.00 | $350,000.00 | --- | --- | --- | $354,200.00 |
| 57-59 Tyndall St. | $42,000.00 | $42,840.00 | $43,697.00 | $44,571.00 | $45,462.00 | $218,570.00 |
| 37-39 Pembroke | $38,000.00 | $38,760.00 | $39,535.00 | $40,326.00 | $41,132.00 | $197,753.00 |
| **Subtotal:** | $604,434.00 | $962,238.00 | $624,485.00 | $636,971.00 | $649,712.00 | $3,477,840.00 |

Next, Palumbo testified with respect to the calculating the projected expenses of the

Rental Properties.  He stated:

> [W]e looked at the history of each property and the expenses for each property
> and the rental operations. A lot of the expenses are structural in nature and they're
> predictable is what I mean. And things like insurances, we know we have to get
> insurance and we had a good handle on what the cost of insurance was because
> we had a history to review. Real estate taxes was [sic], you know, another item
> that was structural.
>
> And then we had items that we embedded also for management fees, for rent up,
> sometimes we're paid commission on rent up. And a reasonable estimate for
> repairs and maintenance for each property. Also, utilities, but utilities was
> somewhat nixed, sometimes the -- some of the units that the tenants were

---

[190] *Id.* at 45:22-25; 46:1-3.

[191] Debtor's Ex. A.

responsible for utilities and some of the units the owners -- or Mr. Saunders was responsible for the utilities so that had to be dissected also.[192]

The Rental Properties' projected expenses for the next five years are as follows:[193]

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Totals |
|---|---|---|---|---|---|---|
| 64 Eaton St. | $41,777.00 | $42,403.00 | $43,040.00 | $43,685.00 | $44,340.00 | $215,245.00 |
| 68-70 Eaton St. | $24,848.00 | $25,221.00 | $25,599.00 | $25,983.00 | $26,373.00 | $128,024.00 |
| 74-76 Eaton St. | $29,498.00 | $29,940.00 | $30,389.00 | $30,845.00 | $31,308.00 | $151,980.00 |
| 106-108 Eaton St. | $22,246.00 | $22,579.00 | $22,918.00 | $23,262.00 | $23,611.00 | $114,616.00 |
| 114-116 Eaton St. | $21,716.00 | $22,042.00 | $22,372.00 | $22,708.00 | $23,048.00 | $111,886.00 |
| 118-120 Eaton St. | $30,646.00 | $31,105.00 | $31,572.00 | $32,046.00 | $32,526.00 | $157,895.00 |
| 140-142 Eaton St. | $20,871.00 | $21,184.00 | $21,502.00 | $21,824.00 | $22,152.00 | $107,533.00 |
| 144 Eaton St. | $20,051.00 | $20,352.00 | $20,657.00 | $20,967.00 | $21,282.00 | $103,309.00 |
| 133-135 Radcliffe St. | $29,953.00 | $30,402.00 | $30,858.00 | $31,321.00 | $31,791.00 | $154,325.00 |
| 345 Hope St. | $8,950.00 | $8,950.00 | --- | --- | --- | $17,900.00 |
| 57-59 Tyndall St. | $22,169.00 | $22,501.00 | $22,839.00 | $23,181.00 | $23,529.00 | $114,219.00 |
| 37-39 Pembroke | $19,564.00 | $19,858.00 | $20,156.00 | $20,458.00 | $20,765.00 | $100,801.00 |
| **Subtotal:** | $292,289.00 | $296,537.00 | $291,902.00 | $296,280.00 | $300,725.00 | $1,477,733.00 |

With respect to projecting the expenses, Palumbo noted that they were largely "structural" and that there was a good history to support his figures.[194]

After determining the projected revenue and expenses, Palumbo subtracted the projected expenses from the projected revenue to ascertain the pre-debt service cash flow:[195]

---

[192] *Id.* at 46:10-24.

[193] Debtor's Ex. A.

[194] Trans. Feb. 19, 2013 at 46:10-16.

[195] *Id.* at 47:18-23.  *See* Debtor's Ex. A.

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Totals |
|---|---|---|---|---|---|---|
| Pre-Debt Service Cash Flow | $312,145.00 | $665,701.00 | $332,583.00 | $340,691.00 | $348,987.00 | $2,000,107.00 |

From there, Palumbo created a capital expenditure reserve of over $100,000 by setting aside 10% of the projected yearly revenue up to $100,000.[196]

| Category | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Totals |
|---|---|---|---|---|---|---|
| Capital Reserve 10% Rent | $60,443.40 | $61,223.80 | $62,448.50 | --- | --- | $184,115.70 |

He testified that 10% is standard in the industry and a reasonable benchmark agreed upon by the Debtor and Malkin.[197]   On cross-examination, Palumbo conceded that he is unaware of the specific maintenance needs of the Rental Properties.[198]

The final component of the cash flow projections was to add a line item for the required debt service under the Debtor's Plan.[199]  The interest rate on the Malkin loan is 7%, but to insert a conservative principle into the projections, they show the interest rate at a constant 7% without factoring in principal reductions.[200]  Principal payments are under the loan are determined by "this formula of rental revenue minus rental expenses minus the CapEx reserve minus

---

[196] Trans. Feb. 19, 2013 at 48:1-14.  *See* Debtor's Ex. A.

[197] Trans. Feb. 19, 2013 at 72:20-22.

[198] *Id.* at 71:5-15.

[199] *Id.* at 48:19-22.

[200] *Id.* at 52:12-25; 53:1-18.

interest."[201]  Accordingly, the following table illustrates the total debt service requirements under

the Debtor's Plan for the next five years:[202]

| Malkin Loan Interest at 7% | $183,540.00 | $183,540.00 | $183,540.00 | $183,540.00 | $183,540.00 | $917,700.00 |
|---|---|---|---|---|---|---|
| Net Cash Flow /Principal Payment | $68,161.60 | $420,937.20 | $86,594.50 | $157,151.00 | $165,447.00 | $898,291.30 |

In sum, Palumbo testified that he is "very comfortable" with the projections and believes

"within a reasonable degree of accounting certainty that those projections are achievable."[203]  By

way of further elaboration, he stated:

> [In] [m]y opinion it would be highly unlikely that it would be followed by another
> insolvency, you know, for a number of reasons. I feel as though, you know, the
> capital structure and one of the primary reasons are the capital structure is a
> responsible capital structure and the payment of the capital structure and the
> lending structure is borrower friendly. And as I mentioned Mr. Saunders' partner
> who is on there also is a very sophisticated financier and real estate person which
> provides a tremendous enhancement to Mr. Saunders' business model going
> forward.[204]

Palumbo further noted that he has verified the commitments behind funds and that Malkin will

be fully secured in his obligations under the Debtor's Plan.[205]  Having reviewed the Debtor's

Plan, Disclosure Statement, and all exhibits thereto, Palumbo also believes that the Debtor's Plan

is feasible.[206]

In contrast, Carlisle testified that in his opinion, based upon his training as a certified

public account and his experience in the student rental field, it is "difficult to determine" whether

---

[201] *Id.* at 49:21-25.

[202] Debtor's Ex. A.

[203] Trans. Feb. 19, 2013 at 57:2-25.

[204] *Id.* at 68:12-21.

[205] *Id.* at 56:19-25; 57:1.

[206] *Id.*at 42:22-25; 56:12-20.

the Debtor's Plan is feasible it will be very challenging for the Debtor to rent the properties and meet those projections.[207]   In support, he stated that while Nash has done an outstanding job getting very high rents for the Rental Properties, it will be difficult for the Debtor to do the same in the future.[208]   Furthermore, Carlisle testified that he did not believe the Debtor's Plan to be adequately capitalized because there is no provision for working capital on day one, as all the proceeds will be used to pay creditors in full.[209]

During his testimony, Palumbo conceded that in order to satisfy all claims, the transaction does not have a line item for working capital on day one.[210]   He testified, however, that there are additional cash commitments and that Malkin has a vested interest in the success of Red Door.[211]   Palumbo clarified that Malkin never specifically said he would loan more, but stated that, based on their conversations, "Mr. Malkin is a serious investor in this particular opportunity and he's going to behave in a way that he wants to grow and preserve the business that he has."[212]

H. The 02908 Plan

Although the 02908 Plan is captioned as a "Plan of Reorganization," it is a misnomer as the 02908 Plan contemplates the liquidation of the Rental Properties through a sale to The 02908 Club.   Generally speaking, the 02908 Plan provides that within thirty days of the confirmation

---

[207] *Id.* at 173:21-25; 174:4-7.   The Debtor objects to the consideration of Carlisle's testimony to attack the Debtor's Plan because he was not called in rebuttal to the Debtor's Plan, but in support of the 02908 Plan.   *See* Trans. Feb. 19, 2013 at 175:10-16.   The objection moot because I find the Debtor's Plan to be confirmable despite Carlisle's testimony.

[208] *Id.* at 174:9-13.

[209] *Id.* at 172:3-14; 173:1-6.

[210] *Id.* at 73:25; 74:1-4.

[211] *Id.* at 74:4-10.

[212] Id. at 75:7-14.

order becoming final, The 02908 Club will purchase each of the Rental Properties for the full amount of the secured claim.   The 02908 Plan states that the Debtor will retain certain "Restricted Assets" which include: (1) his 50% interest in the net sale proceeds of the property owned by the Debtor and Ann Saunders in Teton Village, Wyoming; (2) the balance in the Wells Fargo Checking account; (3) the contents of the Debtor's Bank of America safe deposit box; (4) the Debtor's two thousand shares of Met Life; (5) the Debtor's tax refund; (6) the Debtor's claim against Paul LaPrade; and (7) the Debtor's unimproved real property located at Boston Neck Road in North Kingstown, Rhode Island.[213]   The Restricted Assets also include a payment in the amount of $250,000 to the Debtor from The 02908 Club to be made within five business days of the confirmation order becoming final.[214]   The payment of administrative claims, priority claims, and general unsecured claims will first come from estate funds and then Restricted Assets to the point of exhaustion, except that the Restrict Assets will not be subject to the general unsecured claims.[215]   The 02908 Club will pay the balance of any priority and general unsecured claims, but will have no liability with respect to any administrative claims.[216]   It should be noted that unless any taxes are assessed against the Debtor, the administrative claims are estimated to be fully payable with estate funds.

The 02908 Club plans to fund the 02908 Plan with an equity injection consisting of cash from existing deposit accounts totaling approximately $576,000 and a draw existing loan facilities with Rockland Trust Company up to $1,422,000, as well as a private financing loan

---

[213] The 02908 Plan, Docket No. 587 at 16.

[214] *Id.*

[215] *Id.* at 9, 13-14.

[216] *Id.*

facility up to $3,000,000.[217]   Bank statements and a commitment letter were attached to the

02908 Plan to evidence its ability to consummate the plan.[218]   To determine whether the 02908

Plan is adequately capitalized, Carlisle did a cash flow projection, looking at the revenues the

Rental Properties could yield on a per bed basis factoring in a 7% vacancy rate, the expenses,

and debt service.  At the confirmation hearing, Carlisle testified that based on his education and

experience, the 02908 Plan is adequately capitalized.[219]

Having reviewed the 02908 Plan, Palumbo testified that he would recommend the

Debtor's Plan to the Debtor.[220]   He explained that while the Debtor's Plan is essentially a

refinance transaction that is a non-taxable event, the 02908 Plan requires a title transfer that is a

taxable transaction measured by the sales proceeds versus the eligible basis.[221]   Any such capital

gain would be first reduced by any remaining tax attributes, and then by the funds in the debtor-

in-possession accounts.[222]   Although Palumbo did not know the specifics such as the individual

tax bases of the Rental Properties, he stated that the 02908 Plan would "most likely" generate

capital gains tax liability.[223]   In further support, he testified that:

> We have approximately a $4 million sales price. We have net basis of $2.5
> million, that's a million-and-a-half. We have approximate tax attribute
> carryforward to the 2000 year of a half a million dollars. So that leaves $1
> million. And it's not only subject to capital gains tax rates, but we have some new
> tax elements that Mr. Saunders would be subject to going forward on that gain.

---

[217] *Id.* at Exhibit D.

[218] *Id.*

[219] Trans. Feb. 19, 2013 at 167:22-25.

[220] *Id.* at 66:20-25; 67:1-12.

[221] *Id.* at 62:18-25; 63:1-2.

[222] *Id.* at 64:8-14.

[223] *Id.* at 63:9-18; 77:14-18; 77:25; 78:1-2.

* * *

His capital gains rate between federal and state will probably be around 26 percent, give or take. And then the new ObamaCare rate is another -- just shy of four percent. So he could be in the approximately 30 percent estimate there.[224]

The Debtor, whose equity interest is impaired by the proposed treatment, has voted to reject the 02908 Plan.[225]  Nevertheless, the 02908 Plan seeks to cram down his equity interest.

I. Preference Voting Results

The following voters indicated their preference for the Debtor's Plan:[226]

| Description | Type | Dollar Value |
|---|---|---|
| Ferrucci Russo | Administrative Claim | $35,897.00 |
| DiGennaro & Palumbo | Administrative Claim | $17,750.00 |
| GCD | Secured Claim | $1,357,667.73 |
| Discover Bank | General Unsecured Claim | $11,223.23 |
| The Debtor | Equity Interest | --- |

The claimants in the following table indicated that they preferred the 02908 Plan:[227]

| Description | Type | Dollar Value |
|---|---|---|
| Gary Johnson | Secured Claim | $192,855.00 |
| Electronic Alarms | General Unsecured Creditor | $1,865.38 |
| Cornerstone Construction Corporation, LLC | General Unsecured Creditor | $65,000.00 |
| GE Information Technologies | General Unsecured Claim | $75,592.00 |
| Ocwen Loan Servicing LLC | Secured Claim | $100,478.58 |
| The 02908 Club | General Unsecured Claim | $1,295.50 |
| Avantus | General Unsecured Claim | $2,069.48 |

---

[224] *Id.* at 83:20-25; 84:1-7 (intervening question omitted).

[225] Curiously, in The 02908 Club's Report on Ballots, it represented in a footnote that the Debtor has voted to accept the 02908 Plan.  *See* Docket No. 650.  In subsequent pleadings, The 02908 Club states that the Debtor rejected the 02908 Plan.  I presume that the Report on Ballots is simply contains a typographical error as a vote in favor would be completely inconsistent with the Debtor's position on the confirmability of the 02908 Plan.

[226] Report on Preference Ballots, Docket No. 647-1 at 37-41.

[227] *Id.*

Regine Printing Company, a general unsecured creditor, indicated that it had no preference between the two plans.[228]  Moreover, the parties have stipulated that although preference ballots were mailed to Class R lessees under the Debtor's Plan, they are neither creditors or equity holders and that I should not consider their preference for any purpose.[229]

## III. POSITIONS OF THE PARTIES

In the interest of brevity and coherency, I will address the parties' arguments with respect to each plan separately.  Additionally, while each proponent has the burden of establishing that their respective plan satisfies each element of 11 U.S.C. § 1129(a), this section will be limited to reciting their arguments regarding the contested elements.  I will, of course, address all elements in my analysis of each plan.

### A. The Debtor's Plan

#### 1. The Debtor

The Debtor argues that the evidence presented at the confirmation hearing establishes by a preponderance that the Debtor's Plan is both confirmable and preferable.  With respect to 11 U.S.C. § 1129(a)(1)-(3), the Debtor first contends that the focus is only on the totality of the circumstances surrounding the current plan and that prior plans and events are irrelevant at the confirmation stage.  In this sense, the Debtor suggests that The 02908 Club has "wandered far afield from relevant evidence when it has questioned the debtor's good faith in filing prior plans based upon entirely different factual scenario's [sic] and events, **none of which are before the Court for consideration**."[230]  Focusing solely on the Debtor's Plan, he states that it will pay

---

[228] *Id.*

[229] Stipulation Regarding Plan Preference Forms, Docket No. 658 at 1.

[230] "Debtor, Neil Saunders' Post Confirmation Hearing Memorandum Regarding [sic]" ("Debtor's Brief"), Docket No. 705 at 3 (emphasis in original).

creditors in full and is funded with money earned from the estate and a refinance from the estate's largest creditor, neither of which are against the law. To the contrary, the Debtor posits that his plan will achieve a result that is consistent with the objective purpose of the Bankruptcy Code by enabling him to reorganize his business and pay his creditors.

While The 02908 Club has questioned the feasibility of the Debtor's Plan, the Debtor asserts that Palumbo's testimony was uncontested and adequately supports a finding that the Debtor's Plan will not be followed by a liquidation or further reorganization proceeding. Additionally, to the extent that these issues were contested, the Debtor contends that his testimony evinces that he has no domestic support obligations or employees necessitating the payment of retirement benefits. Moreover, he testified that he will pay all fees due to the United States Trustee.

The Debtor asserts that The 02908 Club lacks standing to object to the Debtor's Plan as either creditor or a competing plan proponent. As a creditor, the Debtor states that The 02908 Club is unimpaired and as such, is conclusively presumed to have accepted the Debtor's Plan. Similarly, to the extent that The 02908 Club is also the proponent of the 02908 Plan, the Debtor argues their standing as party in interest relies on their pecuniary interest in the case, which, again, is fully protected under the Debtor's Plan.

2. The 02908 Club

In the first instance, The 02908 Club argues that I should deny confirmation to the Debtor's Plan using my powers under 11 U.S.C. § 105(a). Relying on the Supreme Court of the United States' decision in *Marrama v. Citizens Bank of Massachusetts*,[231] The 02908 Club states that I have the power under 11 U.S.C. § 105(a) to take any action that is necessary or appropriate

---

[231] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007).

to prevent an abuse of process by an "atypical" debtor.  The 02908 Club contends that the Debtor

is one such "atypical" debtor for three reasons: (1) he illegally attempted to collude with The

02908 Club to prevent it from filing a 100% plan so that he could proceed with his cram down

plan; (2) he made knowing and material misrepresentations to the Court; and (3) he made

statements of a threatening nature to intimidate Carlisle.  Alternatively, The 02908 Club asserts

that for the same reasons the Debtor failed to demonstrate that the Debtor's Plan was proposed in

good faith under 11 U.S.C. § 1129(a)(3).

The first and third allegations are based upon the testimony of Carlisle with respect to his

October 5, 2012 meeting with the Debtor as described in Section II.E of this decision and need

not be repeated.  The 02908 Club argues that the Debtor's testimony is not credible for several

reasons.  First, the Debtor admitted to five of the statements, albeit with some clarification, and

only denied the allegation of collusion outright.  As such, it is incredible that Carlisle's vivid

recollections, which were memorialized, could be accurate except as to the collusion proposal.

Second, as will be discussed below, The 02908 Club alleges that the Debtor has engaged in a

continuous pattern of misrepresentations to this Court.  Third, The 02908 Club contends that the

evidence demonstrates that he deceived his own sister by including the Sister Properties on

Schedule A.  Therefore, I should accept Carlisle's testimony as credible and find that the Debtor

attempted to collude with The 02908 Club.  Furthermore, by seeking to collude, the Debtor also

would have proposed a plan by a means forbidden by law in violation of 11 U.S.C. § 1129(a)(3).

With respect to the alleged misrepresentations, The 02908 Club points to the fact that the

reported revenues of the Rental Properties doubled in the eleven weeks between the filing of the

Second Amended Plan and the Third Amended Plan.  Next, The 02908 Club emphasizes that

although the Debtor represented to this Court in both the Third Amended Plan and the Debtor's

46

Plan that he had an equitable claim to the Sister Properties under a resulting trust theory, the existence of such an agreement was refuted by Allison Saunders' testimony. In a similar vein, The 02908 Club points to the disparity among the values reported for the Rental Properties and alleges that the Debtor has filed information with the Court that is knowingly false or with reckless disregard to its truth.

Lastly, The 02908 Club takes the position that the threatening statements, which the Debtor does not deny making, could not have been made for any purpose other than intimidation.

In the 02908 Objection, The 02908 Club also suggests that the Debtor's Plan was not filed in good faith because the Debtor sought to provide preferential treatment to GCD over all other creditors. This argument is premised on the fact that the values ascribed to the Rental Properties were, in all cases except GCD, substantially lower than the appraised values. The 02908 Club notes that GCD, or the principal behind it, has not so coincidentally become the Debtor's equity investor.

Apart from the preceding arguments, The 02908 Club also contends that the Debtor's Plan is unfeasible. In support, The 02908 Club relies on Carlisle's opinion that the Debtor's Plan's capital structure is inadequate on its face because it lacks working capital on day one. Moreover, The 02908 Club argues that the Debtor improperly bases his feasibility argument on the occupancy rates and rental rates that were in significant part obtained by Nash. Nash testified that he was familiar with rental rates in the area and was able to obtain rates that were above average and increased the occupancy rate from 30% to 80%. Moreover, Carlisle's expert testimony indicated that Nash did such an outstanding job that it would be difficult for the Debtor to replicate the results.

B. The 02908 Plan

1. The 02908 Club

According to The 02908 Club, the evidence at the confirmation hearing demonstrated that the 02908 Plan is feasible because Carlisle testified that the Plan would be capitalized with an initial investment in excess of $1,000,000, with an additional three to four million dollars provided by a private funding group. In arriving at the amount necessary to capitalize the Plan, Carlisle testified that he performed a five-year projection in which he considered revenues, expenses, potential vacancies, maintenance, and debt service. Moreover, The 02908 Club asserts that it has established a successful track record in the student rental business.

Despite my ruling in the Memorandum of Decision dated January 16, 2013, The 02908 Club maintains that the Debtor's equity interest cannot be impaired because he has represented that he has no equity in the Rental Properties. Regardless, The 02908 Club contends that the 02908 Plan can be confirmed despite the Debtor's rejection because the Debtor's interest, if impairable, can be crammed down under 11 U.S.C. § 1129(b)(2)(C). Indeed, because the Debtor has no equity in the Rental Properties, he will *ipso facto* receive the value of his interest.

In response to the Debtor's argument that 11 U.S.C. § 1129(a)(10) precludes confirmation of the 02908 Plan because there is no acceptance from an impaired class, The 02908 Club states that this provision applies only to "creditors" and not interest holders.

2. The Debtor

The Debtor argues that the 02908 Plan cannot be confirmed because 11 U.S.C. § 1129(a)(10) prohibits confirmation of a plan unless at least one impaired class has accepted the plan. He posits that this is "an iron-clad rule"[232] and is supported by the legislative history,

---

[232] Debtor's Objection, Docket No. 655 at 5.

which the Debtor states explains that the purpose of this section was "to ensure at least one 'real' creditor votes for a plan."[233]   As the Debtor is the only impaired class under the plan and has voted to reject it, he reasons that the 02908 Plan will not have an impaired accepting class and therefore, is fatally flawed.

Alternatively, the Debtor avers that his equity interest cannot be crammed down under 11 U.S.C. § 1129(b)(2)(C) because The 02908 Club adduced no evidence by which I could determine the value of that interest.  He posits that the value of his equity interest "certainly includes the projected future value of the income stream and the presumed appreciation in the value of the properties."[234]   For these reasons, the Debtor urges that I find that the 02908 Plan is unconfirmable and consider only the Debtor's Plan.

C. Confirming "Only One Plan" under 11 U.S.C. § 1129(c)

1. The Debtor

 Assuming that I find that both the Debtor's Plan and the 02908 Plan confirmable, the Debtor asserts that the inescapable conclusion is that his is the most beneficial to the creditors and equity holders under the test set forth in *In re River Valley Fitness One LP*.[235]   He notes that under the Debtor's Plan he receives a management fee of $120,000 per year, retains far more of his personal property, and suffers no capital gains tax consequences.  Moreover, the Debtor cites The 02908 Club's failure to obtain the preference vote of either GCD, the largest creditor, or the equity holder.  Instead, "less than 10% of the creditor body" favored the 02908 Plan.[236]   Finally, he argues out that the evidence establishes that the Debtor's Plan is a feasible reorganization

---

[233] Debtor's Brief, Docket No. 705 at 4.

[234] *Id.* at 5.

[235] *In re River Valley Fitness One LP*, No. 01-12829-JMD, 2003 WL 22298573 (Bankr. D.N.H. Sept. 19, 2003).

[236] Debtor's Brief, Docket No. 705 at 7.

"whereas the 02908 [P]lan is the liquidation of an individual human being."[237]   Indeed, relying

on *N.L.R.B. v. Bildisco and Bildisco*,[238] the Debtor urges that it is well-established that

reorganization plans are preferred over liquidation plans.

2. The 02908 Club

In contrast, The 02908 Club maintains that I must choose the 02908 Plan even assuming,

*arguendo*, that I find that the Debtor's Plan is confirmable.   The 02908 Club argues that "type of

plan" considerations do not favor either plan because under both plans the creditors will be paid

in full, the business of operating student rentals will continue uninterrupted, the Rental Properties

will be transferred to new entities, and the Debtor will receive significant consideration.   Indeed,

The 02908 Club notes that under the 02908 Plan, the Debtor, with no risk, retains the Restricted

Assets and receives an additional cash payment of $250,000.   Therefore, The 02908 Club

contends that the avoidance of risk for the reorganizing Debtor is most significant, rendering the

type of plan irrelevant.   For the same reasons, The 02908 Club avers that the treatment of

creditors and equity security holders does not favor either plan.

With respect to feasibility considerations, The 02908 Club reiterates its argument against

the confirmation of the Debtor's Plan that it is unfeasible because the capital structure is

inadequate on its face.   In contrast, it contends that Carlisle is a well-qualified and experienced

certified public account and the *de facto* controller of The 02908 Club and has more knowledge

of the Providence student rental market.   As such, The 02908 Club asserts that this consideration

weighs in its favor.

---

[237] *Id.* at 6.

[238] *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 527 (1984).

Finally, The 02908 Club argues that the preferences of creditors and equity security holders strongly favors the 02908 Plan.  As reflected above in Section II.I, the 02908 Club received more preference votes than the Debtor.  Relying on *In re Applegate Prop., Ltd.*,[239] and *In re Holley Garden Apartments, Ltd.*,[240] however, The 02908 Club argues that the preferences of interested parties should be excluded, meaning that the preferences of The 02908 Club, the Debtor, Palumbo, GCD, and the Debtor should not be considered.  If the interested parties are excluded, the Debtor only received one vote preferring his plan by a general unsecured creditor in the amount of $11,223.23.  In contrast, the 02908 Plan was favored by six creditors with claims totaling $402,353.62.

## IV. **DISCUSSION**

A plan proponent has the burden of proving by a preponderance of the evidence that each requirement of confirmation set forth in 11 U.S.C. § 1129 has been satisfied or is otherwise inapplicable to the plan in question.[241]  The Court has an independent duty to review Chapter 11 plans and ensure compliance with the Bankruptcy Code.[242]  Because two competing plans are now before me, I will address the Debtor's Plan first and the 02908 Plan second.  Ultimately, I may confirm only one of them.[243]

---

[239] *In re Applegate Prop., Ltd.*, 133 B.R. 827 (Bankr. W.D. Tex. 1991).

[240] *In re Holley Garden Apartments, Ltd.*, 238 B.R. 488 (Bankr. M.D. Fla. 2008).

[241] *See In re Chicago Investments, LLC*, 470 B.R. 32, 103 (Bankr. D. Mass. 2012).

[242] *Id.* (*citing In re Salem Suede, Inc.*, 219 B.R. 922, 932 (Bankr. D. Mass. 1998)).

[243] *See* 11 U.S.C. § 1129(c).

A. <u>Confirmability of the Debtor's Plan</u>

For all the reasons set forth below, I find that the Debtor's Plan is confirmable.

1. The 02908 Club's Standing to Object

As a threshold matter, the Debtor would have me find that The 02908 Club lacks standing

to object to the Debtor's Plan because its sole pecuniary interest—a general unsecured claim in

the amount of $1,295—is fully protected by a plan proposing to pay the claim in full within five

business days of the Effective Date.   Acceptance of a plan and confirmability to a plan, however,

are not mutually exclusive concepts.   The premise of the Debtor's argument—that The 02908

Club's pecuniary interest is protected—is only true if the Debtor's Plan is confirmable.   Here,

The 02908 Club asserts that it is not, disputing, *inter alia*, its feasibility.   It is beyond question

that if the Debtor's Plan is indeed unfeasible, the protection the Debtor touts is illusory.   Put

simply, a debtor cannot prevent all creditors from objecting a plan with a mere *proposal* of full

repayment, particularly if that proposal appears fanciful.

2. Denial of Confirmation under 11 U.S.C. § 105(a)

Before delving into the elements of 11 U.S.C. § 1129, The 02908 Club argues that I

should deny confirmation of the Debtor's Plan under 11 U.S.C. § 105(a) because the Debtor is an

"atypical" debtor who must be prevented from abusing the bankruptcy process.   Section 105(a)

of the Bankruptcy Code provides:

> The court may issue any order, process, or judgment that is necessary or
> appropriate to carry out the provisions of this title. No provision of this title
> providing for the raising of an issue by a party in interest shall be construed to
> preclude the court from, sua sponte, taking any action or making any
> determination necessary or appropriate to enforce or implement court orders or
> rules, or to prevent an abuse of process.[244]

---

[244] 11 U.S.C. § 105(a).

52

In *Marrama v. Citizens Bank of Massachusetts*, the Supreme Court of the United States confirmed "the broad authority granted to bankruptcy judges to take any action that is necessary or appropriate 'to prevent an abuse of process' described in § 105(a) of the Code."[245]

While resort to 11 U.S.C. § 105(a) is undoubtedly appropriate when necessary to prevent an abuse of the Chapter 11 process, it would seem doubtful that such necessity normally exists in the context of plan confirmation.  Because the 11 U.S.C. § 1129(a)(3) already requires good faith as a pre-condition to confirmation, there is typically no reason to rely on 11 U.S.C. § 105(a) to guard against abuse.[246]  The hiccup raised by The 02908 Club is that its allegations of collusion, fraud, and intimidation relate primarily to the Debtor's prior plans and not the one currently before me.  Indeed, the Debtor has objected to consideration of these allegations under 11 U.S.C. § 1129(a)(3) on the basis that they are irrelevant to whether the Debtor's Plan "has been proposed in good faith and not by any means forbidden by law."[247]  Given that under 11 U.S.C. § 1129(a)(3) "the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code,"[248] I will consider The 02908 Club's allegations under 11 U.S.C. § 105(a) to the extent necessary.

The events of the October 5, 2012 meeting between the Debtor and Carlisle give rise to The 02908 Club's allegations of collusion and intimidation.  First, Carlisle alleges that the Debtor attempted to persuade him not file a competing plan that would repay all creditors in full so that the secured creditors could instead be crammed down through the Second Amended Plan. In exchange, the Debtor would later sell the Rental Properties to Carlisle/The 02908 Club and

---

[245] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. at 375.

[246] *See* 11 U.S.C. § 1129(a)(3).

[247] *Id.*

[248] *Matter of Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir. 1984).

they would both "share the savings."[249]   The Debtor flatly denies that he attempted to collude

with Carlisle to the detriment of his creditors.   Second, Carlisle alleges that the Debtor made

several threatening statements for the purpose of intimidating him and The 02908 Club.   The

Debtor responds that, to the extent that he made such statements, they are being taken out of

context.

Having had the opportunity to assess the demeanor and credibility of both the Debtor

and Carlisle, I find the Debtor's version of events far more credible.   Generally speaking, I find

Carlisle's account of the October 5, 2012 meeting exaggerated.   While I have no trouble

believing that the Debtor said some unwise and intemperate things—he has admitted as much—I

do not believe that he intended to threaten or intimidate Carlisle.   To the contrary, the Debtor's

testimony painted a much different picture.   Although there is clearly no love lost between the

Debtor and McCann, even Carlisle's testimony suggests that the Debtor made his initial

comment about what he would have done if it was the 1880's in jest in order to break the ice.

From there, I suspect that Carlisle's facetious counter offer that the Debtor purchase The 02908

Club properties provoked and frustrated the Debtor, prompting him to relay what others have

said about McCann.   I do not believe the Debtor said that he would have put a bullet in

McCann's head, nor do I believe the Debtor used the word "family" in his warning to Carlisle.

Despite a claim that he felt threatened and uncomfortable, Carlisle acted in a manner that

belies such an assertion.   His affidavit, which first outlines these allegations, was not filed until

October 19, 2012, two weeks after the meeting and three days after the Debtor filed his first

100% plan.   In light of the vehemence with which The 02908 Club has since argued bad faith, it

is surprising that these allegations, particularly that of collusion, were not brought to either my or

---

[249] Trans. Feb. 19, 2013 at 176:1-2.

the United States Trustee's attention immediately.   Instead, Carlisle informed only his wife, attorney, and McCann.   I further note that the timing of the affidavit suggests that it was a strategic response to the Third Amended Plan.

Moreover, if the Debtor had made a collusive offer and Carlisle had rejected it, it seems illogical that they would then spend the better part of an hour discussing the Spreadsheet in contemplation of a more legitimate sale.   Put another way, if Carlisle had rejected the Debtor's collusive post-bankruptcy sale, why would he stick around to discuss a sale based on values he thought were "outrageously high"?   In sum, I find the allegation of collusion wholly incredible.

The 02908 Club asserts that I cannot find the Debtor's testimony credible because, *inter alia*, he deceived his sister by including the Sister Properties on Schedule A.   The 02908 Club also argues that his position with respect to the Sister Properties indicates a pattern of knowing misrepresentation or reckless indifference to the truth.   I disagree with both contentions. Schedule A and all the Debtor's plans reflect his belief that on the petition date, he had an equitable claim to the Sister Properties.   If the Debtor truly believed he had such a claim, scheduling the Sister Properties was not only appropriate, but *required* regardless of whether or not such a claim ultimately proved sustainable.[250]   Moreover, I fail to see how the Debtor deceived his sister by doing so, even if he had not previously informed her of his intent.

The primary thrust of The 02908 Club's argument is more appropriately characterized as attacking the veracity of the Debtor's claim to the Sister Properties.   Indeed, at the confirmation hearing, The 02908 Club called Allison Saunders to testify that she had no agreement with the Debtor to transfer the Sister Properties.   Therefore, The 02908 Club concludes, the Debtor

---

[250] Ironically, despite The 02908 Club's reliance on *Marrama* to support the claim that the Debtor is an "atypical" debtor, that case involved fraudulent concealment of assets—the exact opposite of The 02908 Club's objection. *See Marrama v. Citizens Bank of Massachusetts*, 549 U.S. at 368-369.

repeatedly lied in the various filings to this Court by claiming he did.  This gross oversimplification ignores the Debtor's subjective intent.  Both Allison Saunders and the Debtor testified that they had a very informal conversation regarding the Sister Properties and that they each walked away with an "understanding" of what would be happening next.  As Allison Saunders testified, she does not know what the Debtor's understanding was with respect to the Sister Properties.  The Debtor, on the other hand, credibly testified that he believed Allison had "walked away" from them.[251]  While it is clear in hindsight that there was no meeting of the minds with respect to a title transfer, the evidence adduced does not indicate that the Debtor's subjective understanding was objectively unreasonable.  To the extent that he represented that a promise existed, that simply was consistent with his understanding.

Next, The 02908 Club contends that the Debtor knowingly filed information with respect to the value of the Rental Properties that he did not believe was true.  In support, they cite the disparities in values reported in the Schedule A, the Debtor's Plan, and the Spreadsheet.[252]  First, I note that the Spreadsheet was never filed with the Court and therefore cannot be evidence of a misrepresentation.  Furthermore, the Spreadsheet was never meant to reflect the actual market value of the Rental Properties, but the value that the Debtor hoped to get out of a sale to The 02908 Club.  Similarly, to the extent that the Debtor testified at his examination that he did not believe the values used in the Debtor's Plan were accurate, it is well established that the Debtor subjectively believes that the Rental Properties are worth considerably more than their appraised value.  Nevertheless, the Rental Properties have been appraised, and the appraiser's values were used in his plans.  As for the values reported in Schedule A, the Debtor credibly testified that he

---

[251] Trans. Feb. 19, 2013 at 116:17-18.

[252] A table illustrating these disparities appears on page 24.

did his best to research and estimate values based on the tax records.   Notably, Schedule A contains such a disclaimer, rendering The 02908 Club's complaint dubious.

Lastly, The 02908 Club asserts that there are material discrepancies between the rental revenues of certain properties reported in the Second Amended Disclosure and the Third Amended Disclosure Statement.   At the confirmation hearing, the Debtor admitted certain figures were considerably higher than were initially disclosed.[253]   No further explanation was given for the disparity.   The 02908 Club would have me infer that the Debtor intentionally understated the revenue of the Rental Properties to support the cram down contained in the Second Amended Plan.   Whereas the Second Amended Plan is no longer in consideration, I am reluctant to find that a bare inaccuracy in that plan, without more, precludes the confirmation of the present 100% plan.

In conclusion, I find that The 02908 Club has not established that the Debtor is an "atypical" debtor whose abuse of the bankruptcy process warrants a summary disqualification of the Debtor's Plan under 11 U.S.C. § 105(a).

### 3. 11 U.S.C. § 1129(a)(1)

Section 1129(a)(1) of the Bankruptcy Code simply requires that the plan comply with the provisions of the Bankruptcy Code.[254]   I find that it does, and incorporate my findings up to this point by reference in support.

### 4. 11 U.S.C. § 1129(a)(2)

Section 1129(a)(2) of the Bankruptcy Code requires that, as a precondition for confirmation, "[t]he proponent of the plan complies with the applicable provisions of this

---

[253] Trans. Feb. 19, 2013 at 150-153.

[254] *See* 11 U.S.C. § 1129(a)(1).

title."[255]   To the extent that The 02908 Club argues that the Debtor has not complied with the Bankruptcy Code based upon the previously discussed allegations of collusion, fraud, and intimidation, the objection is overruled.  I find that the evidence before me establishes the Debtor has complied with the provisions of this title.

### 5. 11 U.S.C. § 1129(a)(3)

Under 11 U.S.C. § 1129(a)(3), the Debtor must demonstrate that the plan "has been proposed in good faith and not by any means forbidden by law."[256]   While the Bankruptcy Code does not define "good faith," "the term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objective and purposes of the Bankruptcy Code."[257]   These purposes include "preservation of businesses as going concerns, and the maximization of the assets recoverable to satisfy unsecured claims."[258]

The Debtor's Plan proposes full repayment to all creditors through an equity investment.  Additionally, it further provides the Debtor with an opportunity to continue his student rental business and earn regular income.  Despite the allegations made by The 02908 Club, I find that the Debtor's Plan has been proposed in good faith.

### 6. 11 U.S.C. § 1129(a)(4)

Section 1129(a)(4) of the Bankruptcy Code provides that, as a condition to confirmation,

[a]ny payment made or to be made by the proponent, by the debtor, or by a person
issuing securities or acquiring property under the plan, for services or for costs
and expenses in or in connection with the case, or in connection with the plan and

---

[255] 11 U.S.C. § 1129(a)(2).

[256] 11 U.S.C. § 1129(a)(3).

[257] *In re Weber*, 209 B.R. 793, 797 (Bankr. D. Mass. 1997).

[258] *Fields Station LLC v. Capitol Food Corp. of Fields Corner (In re Capitol Food Corp. of Fields Corner)*, 490 F.3d 21, 25 (1st Cir. 2007).

incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.[259]

The parties have stipulated that this subsection is not relevant to the Debtor's Plan.[260]   I agree and find that the Debtor has satisfied 11 U.S.C. § 1129(a)(4).

### 7. 11 U.S.C. § 1129(a)(5)

Section 1129(a)(5) of the Bankruptcy Code generally requires the plan proponent to disclose the identity and affiliations of any individual proposed to serve as an officer or director of the debtor after confirmation of the plan and that such appointment be consistent with the interests of creditors.[261]   Additionally, the plan proponent must disclose the identity of any insider that will be employed or retained by the reorganized debtor and describe the nature of any compensation.[262]

The parties stipulated that the Debtor's Plan satisfies this subsection without the need for presenting evidence at the confirmation hearing.[263]   I concur.   The Debtor's Plan clearly discloses that the Debtor will receive an employment contract from Red Door, the successor entity to the Debtor, with compensation in the amount of $120,000 per year for an eight year period and subject to annual renewal thereafter.[264]   Accordingly, the Debtor has satisfied 11 U.S.C. § 1129(a)(5).

---

[259] 11 U.S.C. § 1129(a)(4).

[260] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ I.8.

[261] 11 U.S.C. § 1129(a)(5)(A).

[262] 11 U.S.C. § 1129(a)(5)(B).

[263] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ I.1.

[264] The Debtor's Plan, Docket No. 582 at 14.

### 8. 11 U.S.C. § 1129(a)(6)

Pursuant to 11 U.S.C. § 1129(a)(6), "[a]ny governmental regulatory commission with jurisdiction . . . over the rates of the debtor" must approve "any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."[265]  The Debtor's Plan does not contemplate any change in rates over which a governmental entity has jurisdiction and the parties have stipulated that 11 U.S.C. § 1129(a)(6) is irrelevant.[266]  Therefore, I find that this subsection does not present an impediment to confirmation of the Debtor's Plan.

### 9. 11 U.S.C. § 1129(a)(7)

Section 1129(a)(7) of the Bankruptcy Code generally requires that, absent consent, the holder of an impaired claim or interest must receive property that has a present value equal to a hypothetical Chapter 7 distribution.[267]  In the present case, the parties have stipulated that all classes under the Debtor's Plan are unimpaired except for GCD and the Debtor.  Because both have voted to accept the Debtor's Plan, all holders of a claim or interest in an impaired class have voted to accept the Debtor's Plan, satisfying 11 U.S.C. § 1129(a)(7)(A)(i).

### 10. 11 U.S.C. § 1129(a)(8)

Section 1129(a)(8) of the Bankruptcy Code requires that, "[w]ith respect to each class of claims or interests . . . such class has accepted the plan . . . or such class is not impaired under the plan."[268]  As previously stated, the parties have stipulated that all classes under the Debtor's Plan

---

[265] 11 U.S.C. § 1129(a)(6).

[266] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ I.8.

[267] 11 U.S.C. § 1129(a)(7)(A).

[268] 11 U.S.C. § 1129(a)(8).

are unimpaired except for GCD and the Debtor.[269]   As both have voted to accept the Debtor's

Plan, the Debtor has satisfied 11 U.S.C. § 1129(a)(8).

> 11. 11 U.S.C. § 1129(a)(9)

Section 1129(a)(9) of the Bankruptcy Code provides:

Except to the extent that the holder of a particular claim has agreed to a different
treatment of such claim, the plan provides that—
> (A) with respect to a claim of a kind specified in section 507(a)(2) or
> 507(a)(3) of this title, on the effective date of the plan, the holder of such
> claim will receive on account of such claim cash equal to the allowed
> amount of such claim;
> (B) with respect to a class of claims of a kind specified in section
> 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each
> holder of a claim of such class will receive--
>> (i) if such class has accepted the plan, deferred cash payments of a
>> value, as of the effective date of the plan, equal to the allowed
>> amount of such claim; or
>> (ii) if such class has not accepted the plan, cash on the effective
>> date of the plan equal to the allowed amount of such claim;
> (C) with respect to a claim of a kind specified in section 507(a)(8) of this
> title, the holder of such claim will receive on account of such claim regular
> installment payments in cash--
>> (i) of a total value, as of the effective date of the plan, equal to the
>> allowed amount of such claim;
>> (ii) over a period ending not later than 5 years after the date of the
>> order for relief under section 301, 302, or 303; and
>> (iii) in a manner not less favorable than the most favored
>> nonpriority unsecured claim provided for by the plan (other than
>> cash payments made to a class of creditors under section 1122(b));
>> and
> (D) with respect to a secured claim which would otherwise meet the
> description of an unsecured claim of a governmental unit under section
> 507(a)(8), but for the secured status of that claim, the holder of that claim
> will receive on account of that claim, cash payments, in the same manner
> and over the same period, as prescribed in subparagraph (C).[270]

---

[269] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ I.3.

[270] 11 U.S.C. § 1129(a)(9).

The parties have stipulated that this subsection is not pertinent because GCD and the Debtor have voted to accept the Debtor's Plan and all other classes are unimpaired.[271]  Having reviewed the Debtor's Plan, I agree and find that it satisfies the requirements of this subsection.

### 12. 11 U.S.C. § 1129(a)(10)

Under 11 U.S.C. § 1129(a)(10), if the plan contains an impaired class of claims, "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."[272]  The parties have stipulated that this element of 11 U.S.C. § 1129 has been established because both GCD and the Debtor have voted to accept the Debtor's Plan.[273]  Thus, 11 U.S.C. § 1129(a)(10) is satisfied.

### 13. 11 U.S.C. § 1129(a)(11)

In *In re SW Boston Hotel Venture, LLC,* Judge Feeney explained the requirements of 11 U.S.C. § 1129(a)(11) as follows:

> Section 1129(a)(11) of the Bankruptcy Code provides that a plan may only be confirmed if confirmation is not likely to be followed by liquidation, or the need for further financial reorganization. 11 U.S.C. § 1129(a)(11). Commonly referred to as the feasibility requirement, the purpose of this test is to ensure that the plan is not a "visionary scheme." *See In re Merrimack Valley Oil Co., Inc.*, 32 B.R. 485, 488 (Bankr. D. Mass. 1983). Stated another way, "[t]he purpose of the feasibility test is to determine whether there is a reasonable probability that creditors will receive the payments provided for in the plan." *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 478 (Bankr. S.D. Ohio. 2011) (citations omitted). A plan proponent need not guarantee the success of the plan, but rather must introduce evidence that its plan is realistic. *In re Brice Road Devs., LLC.*, 392 B.R. at 283. Courts consider the following factors in assessing feasibility:
>
> > (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other

---

[271] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ I.4.

[272] 11 U.S.C. § 1129(a)(10).

[273] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ I.5.

related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*In re Trenton Ridge Investors, LLC*, 2011 WL 4442270 at *25 (footnote omitted) (*citing In re U.S. Truck Co., Inc.*, 800 F.2d 581, 589 (6th Cir. 1986)). *See also In re Orfa Corp. of Phil.*, 129 B.R. 404, 411 (Bankr. E.D. Pa. 1991).[274]

While "Courts should closely scrutinize plans that are more 'visionary' than they are realistic, . . . . a plan may be approved despite having a 'marginal prospect of success' if the secured creditor is fully protected in the event of the plan's failure."[275]   Moreover, one bankruptcy court recently observed that:

> The first, best indicator of feasibility is the position of the creditors whose economic interests are at stake. The support or opposition of creditors with skin in the game and an opportunity to study a debtor's proposal is more illuminating to the Court than any expert report or accountant's projections.[276]

Palumbo's unrebutted testimony is that the Debtor's Plan is feasible.   Pre-petition, the Debtor's Rental Properties were not his primary business and appear to have been treated more as an investment than a going concern.   Indeed, the master lease agreements reflect the Debtor's attempt to maintain an income stream from the Rental Properties without having to manage the day to day operations.   This arrangement ultimately created numerous difficulties for the Debtor early on.   Palumbo testified at length about the post-petition improvements made to the Debtor's business model such as: (1) the elimination of the master leases; (2) the implementation of proper communication and accounting systems; (3) the acquisition of firmer payment standards, such as parental guarantees and equal monthly payments; (4) the performance of regular repairs and maintenance; and (5) a general increase in the level of professionalism with which the Rental

---

[274] *In re SW Boston Hotel Venture, LLC*, 460 B.R. at 58-59.

[275] *In re Geijsel*, 480 B.R. 238, 256 (Bankr. N.D. Tex. 2012) (*citing Matter of Briscoe Enterprises, Ltd., II*, 994 F.2d 1160, 1166 (5th Cir. 1993)).

[276] *In re Indianapolis Downs, LLC.*, 486 B.R. 286, 298 (Bankr. D. Del. 2013).

Properties are operated.  This testimony, and the Debtor's post-petition performance, indicates that he is able to manage the Rental Properties profitably going forward.

Palumbo further testified that it was unlikely that the Debtor's Plan would be followed by a further reorganization or liquidation based upon his cash flow analysis.  After explaining the methodology used to prepare cash flow projections, he testified that, in his expert opinion, they are reasonable and achievable.  Indeed, Palumbo further identified several conservative factors built into the cash flow projections, including: (1) a 15% reduction in the Rental Properties' income to account for vacancies; (2) a capital expenditure fund of $100,000; and (3) fixed interest payments.  Moreover, he verified the funding commitments necessary to implement the Debtor's Plan.

The 02908 Club offers two arguments against the feasibility of the Debtor's Plan.  First, Carlisle opines that most of the Debtor's current success in operating the Rental Properties is actually due to Nash's efforts.  He cites Nash's substantial reduction of the vacancy rates, ability to obtain above market rents, and Nash's assertion that he put 50% of the current tenants into the Rental Properties.  Having reviewed the evidence, I am not persuaded that the Debtor will be unable to continue operations effectively.  At the confirmation hearing, Nash's testimony was conclusory and evasive.  While Nash likely reduced the vacancy rate in the Rental Properties to a considerable degree, the evidence is entirely unclear as to how many of the current leases he obtained.  His estimate of 50% appears to have been nothing more than a guess.  Furthermore, Nash's assertion that the rents were above average was not compelling.  Finally, although Carlisle believes it will be difficult for the Debtor to replicate Nash's results, the record is devoid of any indication as to why that might be true, particularly in light of the improvements introduced by Palumbo.

64

The second argument advanced by The 02908 Club is that the Debtor's Plan is unfeasible because there will be no working capital on day one after the payment of all claims.  The absence of working capital for any business is a concern.  That said, the brief absence of working capital does not, by itself, render the Debtor's Plan unfeasible.  As noted by Palumbo, Malkin is a serious investor and it is reasonable to assume that he will behave in a manner to preserve his investment.  The fact that he has over $2,600,000 committed to this endeavor despite the temporary absence of working capital is a strong indicator that he believes the Debtor's Plan is feasible.  I further note that the Debtor's Plan contemplates a net disbursement to the Debtor of approximately $30,000.  While the Debtor has not committed those funds to the success of Red Door, he too can be counted on to do what is necessary to preserve his investment.  Thus, even in the absence of early working capital, the Debtor's Plan has at least a marginal prospect of success.

Therefore, I find that the Debtor's Plan is feasible and satisfies the requirement of 11 U.S.C. § 1129(a)(11).

### 14. 11 U.S.C. § 1129(a)(12)

Section 1129(a)(12) of the Bankruptcy Code requires that "[a]ll fees payable under section 1930 of title 28 . . . have been paid or the plan provides for the payment of all such fees on the effective date of the plan."[277]  At the confirmation hearing, the Debtor credibly testified that he is current with his quarterly fee obligations and will pay any additional fees as they become due.[278]  I further note that the United States Trustee has not filed an objection to

---

[277] 11 U.S.C. § 1129(a)(12).

[278] Trans. Feb. 19, 2013 at 112:4-13.

confirmation or a motion to dismiss for failure to timely pay such fees.  Therefore, I find that this

requirement has been satisfied.

### 15. 11 U.S.C. § 1129(a)(13)

Pursuant to 11 U.S.C. § 1129(a)(13), a plan must provide for the continuation of all

retiree benefits that the debtor is obligated to pay, with or without Court approved modification,

for the defined term.[279]   Here, the Debtor no employees and nor any retirement benefit

obligations.  Thus, this subsection is inapplicable.

### 16. 11 U.S.C. § 1129(a)(14)

Under 11 U.S.C. § 1129(a)(14), "[i]f the debtor is required by a judicial or administrative

order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable

under such order . . . ."[280]   The Debtor's uncontested testimony is that he is not subject to any

domestic support orders.[281]   Accordingly, I find that 11 U.S.C. § 1129(a)(14) is inapplicable.

### 17. 11 U.S.C. § 1129(a)(15)

Section 1129(a)(15) of the Bankruptcy Code provides:

In a case in which the debtor is an individual and in which the holder of an
allowed unsecured claim objects to the confirmation of the plan--
> (A) the value, as of the effective date of the plan, of the property to be
> distributed under the plan on account of such claim is not less than the
> amount of such claim; or
> (B) the value of the property to be distributed under the plan is not less
> than the projected disposable income of the debtor (as defined in section
> 1325(b)(2)) to be received during the 5-year period beginning on the date
> that the first payment is due under the plan, or during the period for which
> the plan provides payments, whichever is longer.[282]

---

[279] 11 U.S.C. § 1129(a)(13).

[280] 11 U.S.C. § 1129(a)(14).

[281] Trans. Feb. 19, 2013 at 88:24-25; 89:1.

[282] 11 U.S.C. § 1129(a)(15).

The parties agree that the Debtor's Plan satisfies this subsection.[283]   I concur, as the Debtor's

Plan proposes full repayment of all allowed unsecured claims.   Accordingly, 11 U.S.C. §

1129(a)(15) is satisfied.

> 18. 11 U.S.C. § 1129(a)(16)

As a pre-requisite to confirmation, 11 U.S.C. § 1129(a)(16) requires that

> [a]ll transfers of property under the plan shall be made in accordance with any
> applicable provisions of nonbankruptcy law that govern the transfer of property
> by a corporation or trust that is not a moneyed, business, or commercial
> corporation or trust.[284]

The parties agree that 11 U.S.C. § 1129(a)(16) is irrelevant to the extent that GCD and the

Debtor have accepted the Debtor's Plan.[285]   Accordingly, this subsection is not an impediment to

confirmation of the Debtor's Plan.

> 19. 11 U.S.C. § 1129(b)

Generally, 11 U.S.C. § 1129(b) provides a mechanism whereby a plan may be confirmed

notwithstanding a rejection by an impaired class so long as the other applicable requirements of

11 U.S.C. § 1129(a) are satisfied.[286]   As previously stated, the parties agree that the only

impaired classes under the Debtor's Plan are GCD and the Debtor.[287]   Because they both have

voted to accept the Debtor's Plan, 11 U.S.C. § 1129(b) is inapplicable.

---

[283] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ I.1.

[284] 11 U.S.C. § 1129(a)(16).

[285] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ I.7.

[286] 11 U.S.C. § 1129(b)(1).

[287] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ I.3.

20. 11 U.S.C. § 1129(d)

Pursuant to 11 U.S.C. § 1129(d) "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."  The parties have stipulated that this subsection is irrelevant.[288]  No tax claims remain outstanding and no governmental unit has filed an objection to the confirmation of the Debtor's Plan.  Accordingly, I find that the Debtor's Plan was not filed for the purpose of avoiding taxes.

21. 11 U.S.C. § 1129(e)

The provisions of 11 U.S.C. § 1129(e) requires the timely confirmation of a plan in a "small business case," as that term is defined in 11 U.S.C. § 101(51)(C).[289]  The parties agree that the present case is not a "small business case."[290]  Therefore, this subsection is inapplicable.

B. Confirmability of the 02908 Plan

As set forth in the following sections, I find that the 02908 Plan is also confirmable.

1. 11 U.S.C. § 1129(a)(1)

As previously stated, 11 U.S.C. § 1129(a)(1) requires that the plan comply with the provisions of the Bankruptcy Code.[291]  Although the Debtor indicated that this subsection is in dispute, he has offered no substantive argument.[292]  Therefore, based on the record before me, I find that the 02908 Plan complies with the Bankruptcy Code.

---

[288] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ I.8.

[289] 11 U.S.C. § 1129(e); *see also* 11 U.S.C. §§ 101(52C), (51D).

[290] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ I.8.

[291] 11 U.S.C. § 1129(a)(1).

[292] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ II.3.

### 2. 11 U.S.C. § 1129(a)(2)

Similarly, under 11 U.S.C. § 1129(a)(2), a plan proponent must comply with the applicable provisions of the Bankruptcy Code.[293]   Again, based on the record before me, I find that The 02908 Club has complied with the Bankruptcy Code in proposing the 02908 Plan.  I further note that the Debtor has offered no argument to the contrary.

### 3. 11 U.S.C. § 1129(a)(3)

Section 1129(a)(3) of the Bankruptcy Code, requires that a plan be "proposed in good faith and not by any means forbidden by law."[294]   Surprisingly, the Debtor has stipulated that the 02908 Plan satisfies this element of 11 U.S.C. § 1129.[295]   Much like the Debtor's Plan, the 02908 Plan proposes full repayment of all creditors, albeit through a liquidation of the Rental Properties.   As such, and in the absence of a dispute, I find that the 02908 Plan has been proposed in good faith.

### 4. 11 U.S.C. § 1129(a)(4)

Pursuant to 11 U.S.C. § 1129(a)(4),

> [a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.[296]

---

[293] 11 U.S.C. § 1129(a)(2).

[294] 11 U.S.C. § 1129(a)(3).

[295] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ II.1.  I am surprised that the Debtor would stipulate to The 02908 Club's good faith in light of his assertion that Carlisle lied about the Debtor's offer to collude at the October 5, 2012 hearing.  Although I found the allegation incredible, I am not prepared to *sua sponte* find that the 02908 Plan was proposed in bad faith on this basis.  Even if I did, however, the outcome of the case would be the same.

[296] 11 U.S.C. § 1129(a)(4).

The Debtor and The 02908 Club have stipulated that the 02908 Plan satisfies this subsection.[297]

In light of the record before me, I agree.  Thus, 11 U.S.C. § 1129(a)(4) is not an impediment to confirmation.

### 5. 11 U.S.C. § 1129(a)(5)

Section 1129(a)(5) of the Bankruptcy Code generally requires, among other things, that the plan proponent to disclose the identity of any individual that will serve as an officer or director of the debtor after confirmation of the plan.[298]  The parties agree that this section is not applicable.[299]  I concur as the Debtor is an individual and the 02908 Plan contemplates a sale of the Rental Properties.  Therefore, 11 U.S.C. § 1129(a)(5) not applicable.

### 6. 11 U.S.C. § 1129(a)(6)

As a condition to confirmation, 11 U.S.C. § 1129(a)(6) requires "any rate change provided for in the plan" over which "[a]ny governmental regulatory commission" has jurisdiction must approve the modification.[300]  Again, the parties agree that this section is not applicable to the 02908 Plan.[301]  Because no rate change is contemplated by the 02908 Plan, I similarly find that this section is not applicable.

### 7. 11 U.S.C. § 1129(a)(7)

As explained by Judge Feeney in *In re SW Boston Hotel Venture, LLC*:

In order for a Chapter 11 plan to be confirmed, 11 U.S.C. § 1129(a)(7) requires that each nonaccepting holder of an impaired class of claims or interests will retain or receive property of a value as of the effective date in an amount that is

---

[297] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ II.1.

[298] 11 U.S.C. § 1129(a)(5).

[299] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ II.2.

[300] 11 U.S.C. § 1129(a)(6).

[301] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ II.2.

not less than the amount such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. . . .

Section 1129(a)(7) requires only that the present value of the distribution under the plan, which must account for the time value of money, must be no less than a dividend upon liquidation. *See* N. Dreher and J. Feeney, Bankruptcy Law Manual § 11:63 (West 2011). "The best interests valuation is to be based on evidence not assumptions, but it is not an exact science." *In re Multiut Corp.*, 449 B.R. 323, 344 (Bankr. N.D. Ill. 2011) (citations omitted).[302]

Although The 02908 Club disagrees with my conclusion, I have already found that the Debtor is impaired under the 02908 Plan because regardless of whether he has any equity in the Rental Properties, the proposed sale would deprive him of the plethora of rights that arise from his ownership of them.[303]   I reiterate that "Congress define[d] impairment in the broadest possible terms,"[304] and that a forced sale simply does not leave "unaltered [the] legal, equitable, and contractual rights" of the Debtor.[305]   Accordingly, the Debtor was entitled to vote for The 02908 Plan and has cast his ballot to reject it.

Because the Debtor, as an impaired interest holder, has rejected the 02908 Plan, The 02908 Club must provide him a distribution that is no less than the dividend he would receive in a Chapter 7 liquidation on account of his equity interest.[306]   Because there is no equity in any of the Rental Properties, the Debtor would receive nothing in a Chapter 7 case.  Here, however, the 02908 Plan provides that the Debtor will receive a payment in the amount of $250,000.  As such, the 02908 Plan easily satisfies 11 U.S.C. § 1129(a)(7)(A)(ii).

---

[302] *In re SW Boston Hotel Venture, LLC*, 460 B.R. at 65.

[303] *In re Saunders*, No. 11-12960-WCH, Slip Op. (Bankr. D.R.I. Jan. 16, 2013).

[304] *In re Madison Hotel Associates*, 749 F.2d 410, 418 (7th Cir.1984).

[305] 11 U.S.C. § 1124(1).

[306] 11 U.S.C. § 1129(a)(7)(A)(ii).

71

8. 11 U.S.C. § 1129(a)(8)

Section 1129(a)(8) of the Bankruptcy Code requires that, "[w]ith respect to each class of claims or interests . . . such class has accepted the plan . . . or such class is not impaired under the plan."   Notwithstanding The 02908 Club's objection, the Debtor was entitled to vote for the 02908 Plan and has cast his ballot to reject it.  Accordingly, The 02908 Club has not satisfied 11 U.S.C. § 1129(a)(8).

9. 11 U.S.C. § 1129(a)(9)

Section 1129(a)(9) of the Bankruptcy Code provides:

Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—
    (A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;
    (B) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive--
        (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
        (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;
    (C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash--
        (i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;
        (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and
        (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and
    (D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim

> will receive on account of that claim, cash payments, in the same manner
> and over the same period, as prescribed in subparagraph (C).[307]

The Debtor and The 02908 Club agree that the 02908 Plan satisfies 11 U.S.C. §§ 1129(a)(9)(A),

(B), but the Debtor disputes that subsections (C) and (D) are met.[308]   Section 507(a)(8) of the

Bankruptcy Code sets forth a priority for certain tax claims, including income taxes.[309]

The 02908 Plan contemplates that any tax liabilities will be paid from estate funds,

including the $250,000 that The 02908 Club will pay to the Debtor.  Currently, there are no tax

claims outstanding.  Although Palumbo credibly testified that the 02908 Plan would most likely

result in the assessment of capital gains taxes against the Debtor, there was no evidence

quantifying such liabilities.  The Debtor, or his professional, is the sole party in possession of the

information necessary to estimate the possible tax consequences of the proposed sale of the

Rental Properties.  Nevertheless, he offered nothing despite relying on the possibility of negative

tax consequences as a basis for his objection.  In light of the Debtor's failure to provide more

compelling evidence, I infer that the funds available to the estate will be sufficient to pay any

capital gains taxes that arise.  Thus, 11 U.S.C. § 1129(a)(9)(C) and (D) are satisfied.

### 10. 11 U.S.C. § 1129(a)(10)

Pursuant to 11 U.S.C. § 1129(a)(10), if the plan contains an impaired class of claims, "at

least one class of claims that is impaired under the plan has accepted the plan, determined

without including any acceptance of the plan by any insider."[310]   The Debtor is the only impaired

class under the 02908 Plan and he has rejected it.  Therefore, the Debtor argues that the 02908

---

[307] 11 U.S.C. § 1129(a)(9).

[308] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ II.1, 3.

[309] 11 U.S.C. § 507(a)(8).

[310] 11 U.S.C. § 1129(a)(10).

Plan cannot satisfy this section. The Debtor, however, is mistaken as 11 U.S.C. § 1129(a)(10) applies only to a "class of claims," not a class of "interests."[311] Because Congress used the phrase "class of claims or interests" in other paragraphs of 11 U.S.C. § 1129,[312] I must conclude the omission of the word "interests" from 11 U.S.C. § 1129(a)(10) was intentional under the maxim of *expressio unius est exclusio alterious*—the expression of one thing is the exclusion of other things.[313] Accordingly, I find that 11 U.S.C. § 1129(a)(10) is not applicable to the 02908 Plan.

### 11. 11 U.S.C. § 1129(a)(11)

I have already discussed the feasibility requirement of 11 U.S.C. § 1129(a)(11) at length and will not repeat the standard here. The evidence at the confirmation hearing demonstrated that the 02908 Plan would be sufficiently capitalized with an initial investment in excess of $1,000,000, and, if necessary, an additional three to four million dollars provided by a private funding group. Moreover, The 02908 Club is already in the business of student rentals with a substantially larger share of the market than the Debtor. As the Debtor will receive a cash payment in the amount of $250,000 under the 02908 Plan and will be able to retain many of his assets other than the Rental Properties, I find that it is unlikely that the 02908 Plan will be followed by a further reorganization or liquidation.[314]

---

[311] *Id.*

[312] *See, e.g.*, 11 U.S.C. § 1129(a)(7), (a)(8).

[313] *See, e.g., United States v. Hernandez-Ferrer*, 599 F.3d 63, 67-68 (1st Cir. 2010).

[314] For the reasons stated above, I infer that the assessment of any capital gains taxes will not render the 02908 Plan unfeasible.

### 12. 11 U.S.C. § 1129(a)(12)

As previously stated, 11 U.S.C. § 1129(a)(12) requires as a condition to confirmation that

"[a]ll fees payable under section 1930 of title 28 . . . have been paid or the plan provides for the

payment of all such fees on the effective date of the plan."  The Debtor credibly testified that he

is current with his quarterly fee obligations.[315]  In the event that additional fees become due that

have not been paid, the 02908 Plan provides that such administrative expenses shall be paid on

its effective date from estate funds.  In either event, the parties agree that the 02908 Plan satisfies

11 U.S.C. § 1129(a)(12).  Therefore, I find this provision does not preclude confirmation of the

02908 Plan.

### 13. 11 U.S.C. § 1129(a)(13)

As the Debtor has neither employees nor retiree benefit obligations, the requirement of 11

U.S.C. § 1129(a)(13) that a plan must provide for the continuation of such benefits is

inapplicable.[316]

### 14. 11 U.S.C. § 1129(a)(14)

As previously stated with respect to the Debtor's Plan, the Debtor credibly testified that

he has no domestic support obligations and thus, this section inapplicable in this case.

### 15. 11 U.S.C. § 1129(a)(15)

Section 1129(a)(15) of the Bankruptcy Code provides:

In a case in which the debtor is an individual and in which the holder of an
allowed unsecured claim objects to the confirmation of the plan--
    (A) the value, as of the effective date of the plan, of the property to be
    distributed under the plan on account of such claim is not less than the
    amount of such claim; or
    (B) the value of the property to be distributed under the plan is not less
    than the projected disposable income of the debtor (as defined in section

---

[315] Trans. Feb. 19, 2013 at 112:4-13.

[316] *See* Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ II.2.

1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.[317]

The Debtor disputes that the 02908 Plan satisfies this section.[318]   As no holder of an unsecured claim has objected to the 02908 Plan, I find that 11 U.S.C. § 1129(a)(15) is satisfied.

16. 11 U.S.C. § 1129(a)(16)

Section 1129(a)(16) of the Bankruptcy Code requires that "[a]ll transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law . . . ."[319]   The parties have stipulated that the sale transaction contemplated in the 02908 Plan complies with this provision.[320]   Accordingly, The 02908 Club has established that that the 02908 Plan satisfies 11 U.S.C. § 1129(a)(16).

17. 11 U.S.C. § 1129(b)

Section 1129(b)(1) of the Bankruptcy Code provides, in relevant part:

if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.[321]

A plan is further defined to be "fair and equitable" with respect to a class of interests if:

(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to

---

[317] 11 U.S.C. § 1129(a)(15).

[318] See Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ II.3.

[319] 11 U.S.C. § 1129(a)(16).

[320] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ II.2.

[321] 11 U.S.C. § 1129(b)(1).

which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or
(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.[322]

As explained above, the Debtor argues that his equity interest cannot be crammed down under this section because The 02908 Club adduced no evidence by which I could determine the value of his interest. He further contends that the value of his interest would include the projected future value of the income stream and the presumed appreciation of the Rental Properties. The 02908 Club, on the other hand, asserts that his equity interest has no value as the Debtor lacks equity in the Rental Properties.

The 02908 Club correctly states that the value of the Debtor's equity interest is equal to the value of his equity in the Rental Properties, namely, zero. The 02908 Club did not need to introduce evidence to establish this because they could simply rely on the values set forth in the Debtor's Plan. Moreover, the appraised value of an income property already takes into account its future revenue potential. Ultimately, this is yet another example of the Debtor not accepting the accuracy of the appraised values of the Rental Properties. With respect to his argument that the value of his interest includes future appreciation, that is simply irrational. That would be akin to selling a property today for what it will be worth ten years from now. The value of his interest is zero, and the 02908 Plan provides him with $250,000. As such, The 02908 Club can successfully cram down the Debtor's equity interest.

### 18. 11 U.S.C. § 1129(d)

As explained above, 11 U.S.C. § 1129(d) prohibits confirmation of a plan whose principal purpose is to avoid taxes.[323] In light of the parties stipulation that this section is not

---

[322] 11 U.S.C. § 1129(b)(2)(C).

[323] 11 U.S.C. § 1129(d).

applicable to the 02908 Plan and the absence of any objection from the taxing authorities, I find

that the 02908 Plan was not filed for the purpose of avoiding taxes.[324]

> 19. 11 U.S.C. § 1129(e)

As previously stated, 11 U.S.C. § 1129(e) only applies to "small business cases," which

the Debtor's case is not.[325]   Therefore, this section is inapplicable.

> C. Confirming "Only One Plan" under 11 U.S.C. § 1129(c)

Section 1129(c) of the Bankruptcy Code provides:

> Notwithstanding subsections (a) and (b) of this section and except as provided in
> section 1127(b) of this title, the court may confirm only one plan, unless the order
> of confirmation in the case has been revoked under section 1144 of this title. If the
> requirements of subsections (a) and (b) of this section are met with respect to
> more than one plan, the court shall consider the preferences of creditors and
> equity security holders in determining which plan to confirm.[326]

To be clear, I need only *consider* the preferences of the creditors and equity holders, "not simply

obey them."[327]   Instead, I must "make the choice that is most beneficial to all creditors and

equity security holders."[328]   Therefore, in making my choice, I must also consider: "(1) the type

of plan; (2) the treatment of creditors and equity security holders; [and] (3) the feasibility of the

plan . . . ."[329]

Taking all these factors into account, I find that the Debtor's Plan is clearly more

beneficial to all creditors and equity security holders.  While The 02908 Club would have me

---

[324] Consent Order For 11 U.S.C. § 1129 Stipulation, Docket No. 657 at ¶ II.2.

[325] *See id.*

[326] 11 U.S.C. § 1129(c).

[327] *In re River Valley Fitness One LP*, 2003 WL 22298573 at *9 (*citing In re River Village Assoc.*, 181 B.R. 795,
807 (E.D. Pa. 1995)).

[328] *Id.* (*citing In re Sound Radio, Inc.*, 93 B.R. 849, 859 (Bankr. D.N.J. 1988)).

[329] *Id.  See Internet Navigator Inc.*, 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003); *In re Holley Garden Apartments,
Ltd.*, 238 B.R. 488, 493 (Bankr. M.D. Fla. 1999).

discount the Debtor's preference (along with GCD, Ferrucci Russo, and DiGennaro & Palumbo) because he is an "insider," discounting an individual debtor's preference is inappropriate under the present circumstances.  All the claimholders will be paid in full under either plan, but the Debtor's treatment will vary significantly.  Under the Debtor's Plan, the Debtor will receive a 66.67% interest in Red Door, a management fee of $120,000 per year, and suffer no capital gains taxes.  In contrast, the 02908 Plan provides that he will receive $250,000 and retain the "Restricted Assets" subject to any payments that must be made out of them, but lose the Rental Properties and incur capital gains taxes.  Even if the tax liabilities are less than the funds available to pay them, they remain a fair consideration.

Admittedly, the 02908 Plan has a slight edge with respect to feasibility in as much as Red Door's success is not assured.  Regardless, the risk of failure will be borne solely by the Debtor. I further note that Palumbo testified that he would recommend the Debtor's Plan to him.

In closing, I do not hold that a plan cannot be confirmed against the preference of a Chapter 11 debtor, even when that debtor is an individual.  Nor have I ignored the preferences of the seven creditors who voted for the 02908 Plan.  My holding here is premised on the fact that all classes other than the Debtor will not only be treated the same under both plans, but receive payment in full within thirty days of the entry of the confirmation order, while the Debtor's treatment varies considerably.  Under such circumstances, the individual debtor's preference should be afforded some deference.

## V. <u>CONCLUSION</u>

In light of the foregoing, I will enter an order confirming the Debtor's Plan.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: April 8, 2013


Counsel Appearing:

    Vincent A. Indeglia, Moshe S. Berman, Ferrucci Russo P.C., Providence, RI,
        for the Debtor
    Russell D. Raskin, Raskin & Berman, Providence, RI,
        for the Debtor
    Sandra Nicholls, Office of the United States Trustee, Providence, RI,
        for the United States Trustee
    Theodore Orson, Matthew D. Rocheleau, Orson and Brusini Ltd., Providence, RI,
        for The 02908 Club Holdings, LLC